UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.                                              No. 23-cr-134 (VSB)

DARRYL COHEN,

               *Defendant.*

---

### <u>DEFENDANT DARRYL COHEN'S MOTIONS *IN LIMINE*</u>

MICHAEL L. BLOCH, ESQ.
BENJAMIN D. WHITE, ESQ.
CRISTINA ALVAREZ, ESQ.

BLOCH & WHITE LLP
90 Broad Street, Suite 703
New York, NY 10004
(212) 901-3820

MARK SEDLANDER, ESQ.

MANCINI SHENK LLP
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
(424) 652-4016

*Counsel for Darryl Cohen*

To:  JAY CLAYTON, ESQ.
    United States Attorney
    Southern District of New York
    26 Federal Plaza, 37th Floor
    New York, New York 10278
    *Attn: Brandon C. Thompson*
    *Kevin B. Mead*
    *William Kinder*
    *Assistant United States Attorneys*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 2

ARGUMENT ..................................................................................................... 3

I.    The Court Should Preclude Evidence of the Lloyds' Use of Beast Basketball Funds .... 4

II.   The Court Should Preclude Testimony from Michael Lutterloh .................................... 15

III.  The Court Should Preclude Testimony from Peter Melley ........................................... 21

IV.   The Court Should Preclude Mr. Cohen's Text Messages ████████████████
      █████ ....................................................................................................... 22

V.    The Court Should Exclude Any Evidence Relating to the Charges Brought Against
      Charles Briscoe and Calvin Darden ........................................................................ 22

CONCLUSION ................................................................................................. 23

# **TABLE OF AUTHORITIES**

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*,
  2010 WL 741971 (E.D.N.Y. Feb. 23, 2010) ................................................. 18

*Amley v. Sumitomo Mitsui Banking Corp.*, 2020 WL 8514825 (S.D.N.Y. Dec. 8, 2020) ........... 20

*Armouth Int'l Inc. v. Fallas*, 2023 WL 6439920 (S.D.N.Y. Oct. 3, 2023) ................................ 16

*Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004) .......... 17, 18, 20, 22

*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010) ........................................ 20

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................................ 4

*Davis v. City of New York*, 959 F. Supp. 2d 427 (S.D.N.Y. 2013) ............................... 20

*Didzbalis v. Sheridan Transp. Co.*, 2002 WL 31619071 (S.D.N.Y. Nov. 19, 2002) .................. 18

*Fidelity Nat. Title Ins. Co. v. Cole Taylor Bank*, 878 F. Supp. 2d 453 (S.D.N.Y. 2012) ............ 18

*Helena Assocs., LLC v. EFCO Corp.*, 2008 WL 2117621 (S.D.N.Y. May 14, 2008) ................ 18

*In re Elysium Health-ChromaDex Litigation*, 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) ........ 21

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
  988 F. Supp. 2d 395 (S.D.N.Y. 2013) .................................................... 18

*Securities and Exchange Commission v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........... 20

*Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363 (S.D.N.Y. 2024) .......................... 21

*United States v. Aguilar,* 2024 WL 759973 (E.D.N.Y. Feb. 22, 2024) ........................... 9

*United States v. Aguilar*, 2023 WL 3807731 (E.D.N.Y. June 2, 2023) ........................... 9

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ..................................... 20, 21

*United States v. Bradley,* 2022 WL 1708400 (D. Conn. May 27, 2022) ..................... 4, 17, 18

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) ....................................... 13, 14

*United States v. DiMassa*, 117 F.4th 477 (2d Cir. 2024) ....................................... 11

*United States v. Dove*, 884 F.3d 138 (2d Cir. 2018) ........................................... 13

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ...................................... 3

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ......................................... 3

*United States v. Graham*, 2019 WL 2366724 (S.D.N.Y. May 31, 2019) ......................... 11

*United States v. Graham,* 51 F.4th 67 (2d Cir. 2022) ........................................ 11

*United States v. Ionia Mgmt. S.A.*, 555 F.3d 303 (2d Cir. 2009) .............................. 13

*United States v. Jackson*, 2021 WL 62109 (E.D.N.Y. Jan. 7, 2021) ............................................. 8

*United States v. James*, 607 F. Supp. 3d 246 (E.D.N.Y. 2022) ...................................................... 16

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007)................................................................... 16

*United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021) ................................................................ 13

*United States v. Khan*, 591 F. Supp. 2d 202 (E.D.N.Y. 2008) ......................................................... 9

*United States v. Konstantinovskiy*, 2024 WL 3360379 (E.D.N.Y. July 10, 2024) ............. 8, 13, 16

*United States v. Kurland*, 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ...................................... 8

*United States v. Kurland,* 2024 WL 5165547 (2d Cir. Dec. 19, 2024)........................................... 8

*United States v. Lyles*, 593 F.2d 182 (2d Cir. 1979).................................................................... 8

*United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) ............................................................ 4

*United States v. Menendez*, 2025 WL 547794 (S.D.N.Y. Feb. 19, 2025) ..................................... 4

*United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005) ................................................................. 14

*United States v. Mollica*, 849 F.2d 723 (2d Cir. 1988)................................................................. 14

*United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989)................................................................. 11

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ................................................................... 4

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*,
    828 F. Supp. 2d 698 (S.D.N.Y. 2011) ...................................................................... 13

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ............................................................ 13

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988)...................................................................... 20

*United States v. Scop*, 856 F.2d 5 (2d Cir. 1988).......................................................................... 20

*United States v. Stein*, 521 F. Supp. 2d 266 (S.D.N.Y. 2007) .................................................. 8, 11

*United States v. Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015)..................................................... 4

*United States v. Valle*, 2013 WL 440687 (S.D.N.Y. Feb. 2, 2013) ................................................. 4

*United States v. Wozniak*, 126 F.3d 105 (2d Cir. 1997)................................................................. 14

*United States v. Zingaro*, 858 F.2d 94 (2d Cir. 1988) ................................................................. 14

*Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 171 (D. Conn. 2005) ............... 18

## Rules

Fed. R. Crim. P. 16(a)(1)(G)(iii)................................................................................................... 4

Fed. R. Evid 702 ........................................................................................................................ 4

Fed. R. Evid. 401 ............................................................................................. 3, 6, 7

Fed. R. Evid. 402 ................................................................................................. 3

Fed. R. Evid. 403 ............................................................................................. 3, 6, 7

Fed. R. Evid. 404 ......................................................................................... 3, 6, 9, 11

Fed. R. Evid. 602 ...............................................................................................

Fed. R. Evid. 701 ....................................................................................... 4, 16, 18, 20

## PRELIMINARY STATEMENT

Defendant Darryl Cohen respectfully submits this memorandum in support of his motions *in limine* made pursuant to Federal Rules of Evidence ("FRE") 401, 402, 403, 701, and 702.

The Government should not be permitted to make the forthcoming trial about anything other than the discrete charges it indicted: whether Mr. Cohen stole from the three clients identified in the Indictment. The Government, however, has indicated its intent to introduce several lines of inflammatory, improper, and prejudicial evidence that bear little to no relevance to that charged conduct. For an obvious example, the Government seeks to introduce evidence suggesting that the non-party executives of a non-profit organization (Beast Basketball) fraudulently obtained a loan from the Small Business Administration and used the funds to buy themselves luxury items, all conduct absent from the allegations in the Indictment and wholly unrelated to the allegations that Mr. Cohen transferred money to Beast Basketball without his clients' authorization.[1] On top of that, the Government tries to sneak expert testimony in through the backdoor of several lay witnesses, most notably in the form of a witness the Government claims will testify about "life insurance policies and viatical life settlements, including testimony about how such life insurance products operate, are regulated, and are transacted." *See* Ex. A, November 25, 2025, Non-Expert Witness Letter at 2. Courts recognize consistently that just this type of "custom and practice" testimony from a non-percipient witness must come from an expert. What's more, the Government's own witness has acknowledged that the relevant "regulations" in the Government's

---

[1] We also understand the Government is also seeking to introduce other inflammatory and salacious evidence that has no bearing on any claims in the Indictment, including (i) evidence about Mr. Cohen's supposed ███████████; (ii) evidence about Mr. Cohen's divorce; (iii) other uncharged "claims," "concerns," and "allegations" raised by other individuals about Mr. Cohen; (iv) a purported "investigation" by Morgan Stanley; (v) Mr. Cohen's supposed "violation of Morgan Stanley and FINRA policies"; and (vi) Mr. Cohen's supposed "failure to pay taxes." Because the Government has represented that it will be affirmatively moving *in limine* today on those topics, we will explain why that evidence is inadmissible and should be precluded in opposition to that motion.

disclosure do not even exist.  Mr. Cohen moves to preclude the Government from taking these unlawful and unfair steps and to ensure a fair trial.

## **BACKGROUND**

Broadly speaking, the Government has alleged that Mr. Cohen defrauded three of his clients at Morgan Stanley (Chandler Parsons, Courtney Lee, and Jrue Holiday) by engaging in three conspiratorial schemes with his co-defendant, Brian Gilder.  The Indictment focuses on three discrete sets of conduct.  *First*, the Government alleges that Mr. Cohen fraudulently induced the three clients to invest in life insurance settlement policies "at massive markups, from which COHEN and GILDER secretly profited."  Indictment ¶ 2.  *Second*, the Government alleges that Mr. Cohen fraudulently diverted funds from Messrs. Parsons and Lee by way of donations to Beast Basketball, a charitable organization focused on youth basketball.  *Third*, the Government alleges that Mr. Cohen misappropriated money from Mr. Parsons to repay loans made by another client, Nyjer Morgan.

Mr. Cohen respectfully submits this memorandum in support of his motions *in limine* to: (i) preclude certain evidence relating to the use of Beast Basketball funds; (ii) preclude or, in the alternative, limit the testimony of Michael Lutterloh; and (iii) preclude or, in the alternative, limit the testimony of Peter Melley. To ensure access to a fair trial, Mr. Cohen respectfully requests that the Court schedule a hearing to address the foregoing.

\*       \*       \*

It bears noting that just last Friday, December 19, 2025, the Government sent the defense a large production of material, included a voluminous set of proposed exhibits and 18 U.S.C. § 3500 material.  The defense is also evaluating other disclosures made by the Government and for which the defense has pending questions out to the Government (including as to the Government's

notification about certain "Non-Expert Witnesses" that it plans to call at trial). The defense thus reserves the right to seek additional rulings, whether by motion *in limine* or at trial, as additional evidentiary issues emerge.

### ARGUMENT

Only relevant evidence is admissible at trial. *See* Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). Under FRE 403's balancing test, relevant evidence may nonetheless be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403 is concerned with "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995); *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," although it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404. In considering the admissibility of evidence pursuant to Rule 404(b), a court must consider whether the evidence is "offered for a proper purpose—that is, does it go to something other than the defendant's character or criminal propensity?;" whether the evidence is relevant; whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice; and whether the "court administered an appropriate limiting instruction." *United*

*States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015) (citing *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009)).

Rule 701(c) permits opinion testimony by lay witnesses so long as, among other things, that testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). This provision is "intended 'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amend.). Rule 702, which governs expert testimony, requires that expert testimony be "based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid 702(b)-(d). Thus, expert testimony must satisfy both Rule 702's reliability requirement, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), as well as Federal Rule of Criminal Procedure 16(a)(1)(G)'s disclosure requirements, *see* Fed. R. Crim. P. 16(a)(1)(G)(iii). The Court may preclude the testimony for failure to comply with Rule 16's disclosure requirements. *See, e.g.*, *United States v. Valle*, 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); *United States v. Bradley,* 2022 WL 1708400, at *7 (D. Conn. May 27, 2022) ("To the extent the Government argues that the SEEC witness testimony is nevertheless admissible as expert opinion testimony, the Government has failed to satisfy the requirements for the timely disclosure of expert witnesses under this District's Standing Order on Criminal Discovery"); *United States v. Menendez*, 2025 WL 547794, at *5 (S.D.N.Y. Feb. 19, 2025).

## I.    The Court Should Preclude Evidence of the Lloyds' Use of Beast Basketball Funds

The Government alleges that Mr. Cohen defrauded Chandler Parsons and Courtney Lee by fraudulently transferring their money to a registered non-profit called Beast Basketball without their knowledge. *See* Indictment ¶¶ 2, 26-27. In a November 30, 2025 letter, the Government

4

represented that it would seek to admit evidence of various Beast Basketball payments authorized by the non-profit's CEO Taba Lloyd—these payments include transfers made from Beast Basketball's bank account to Ms. Lloyd, her husband and Beast Basketball CEO Ramel Lloyd, and their child Taylor Lloyd, as well as car payments and purchases of other supposedly luxury items (the "Lloyds' Beast Basketball Payments").   Notably, the Lloyds' Beast Basketball Payments were made in two distinct categorical contexts.  *First*, there are payments the Lloyds made prior to March 2020, when Beast Basketball "functionally ceased all operations when the COVID pandemic began" and after which the "Beast Bank Account had a negative balance." December 17, 2025, Gov't Letter at 5.  *All of the money allegedly taken from Messrs. Parsons and Lee had been spent prior to this time period.*  Further, as the Government acknowledges, Beast Basketball made legitimate expenditures during this period in furtherance of its charitable mission. *Second*, there are payments the Lloyds made *after* July 2020, which consisted entirely of funds the Lloyds obtained pursuant to a loan from the U.S. Small Business Administration ("SBA").  The Government alleges that the Lloyds used these SBA funds to purchase "luxury retail goods, travel, dining, utility bills, and other personal expenses."  To be clear, *none of these payments were made with funds allegedly obtained from Messrs. Parsons and Lee.*  Nor is there any evidence that Mr. Cohen had any involvement in or awareness of the Lloyds' securing of an SBA loan in July 2020 or how the Lloyds chose to spend any of that money.

The Government seeks to introduce evidence of all of the Lloyds' Beast Basketball Payments, including the payments made from monies the Lloyds obtained from an SBA loan.  We also understand the Government may seek to cross-examine Ms. or Mr. Lloyd on these payments should either testify.  Mr. Cohen moves to preclude the Government from introducing evidence of any of the Lloyds' Beast Basketball Payments for which there is no evidence that Mr. Cohen was

5

aware.[2]  In particular, Mr. Cohen moves to preclude any evidence of the payments made from the SBA loan—either as affirmative evidence or on cross-examination of either of the Lloyds—which includes each of the payments identified by the Government in its November 30 letter.  Evidence of how the Lloyds personally spent Beast Basketball's money is not probative of Mr. Cohen's culpability and is thus irrelevant under FRE 401 (and its introduction would trigger sideshows requiring mini-trials inside of a trial).  As to the SBA monies, that involves an entirely separate crime allegedly committed by the Lloyds without Mr. Cohen's awareness and with money that was supplied by the federal government, not any of the alleged victims in this case.  Because the Government has suggested that the Lloyds criminally misused these monies and will likely highlight expenditures on luxury cars and other items, it is also unduly prejudicial and likely to confuse the jury in violation of FRE 403.  Moreover, these alleged payments concern additional and irrelevant transactions not charged in the Indictment and thus should be precluded under FRE 404(b).  Finally, inclusion of such evidence is so improper that it would risk a constructive amendment of the Indictment.

*FRE 401, 402, 403*.  The Lloyds' Beast Basketball Payments—particularly from the SBA loans—bear no relevance to the relevant issue to be tried: whether Mr. Cohen fraudulently diverted payments *from* Messrs. Parsons and Lee *to* Beast Basketball without their authorization.  *See* Indictment ¶¶ 2, 26-27.  Notably, the Government itself has previously taken the position that Beast Basketball's other unrelated payments are not relevant, at least when it comes to the defense's case.  Specifically, the Government wrote in its November 30th letter that the relevant issue to be tried is "whether Chandler Parsons and Courtney Lee approved and authorized the transfers to Beast Basketball and whether Cohen deceived them as to the transfers; *not whether*

---

[2] The defense concedes that payments for which there is evidence that Mr. Cohen was aware are admissible, such as payments for the training facility.

*Beast Basketball utilized some fraction of those funds for basketball.*"  November 30, 2025, Gov't Letter at 2 (emphasis added).  The Government is correct that not every Beast Basketball payment is relevant to this case.  But it gets it wholly backwards in arguing that Beast Basketball's *legitimate* payments are irrelevant, yet the Lloyds' *illegitimate* payments are relevant.  And that is for a simple reason: there is ample evidence that Mr. Cohen knew about Beast Basketball's legitimate payments (thus shedding light on his intent in helping secure donations from Messrs. Parsons and Lee), and *no* evidence that Mr. Cohen knew about the Lloyds' supposedly illegitimate payments (and most certainly the monies spent from the SBA loan).  In other words, how the Lloyds subsequently used Beast Basketball monies—in a way unbeknownst to Mr. Cohen—is irrelevant to whether Messrs. Parsons or Lee had previously approved and authorized Mr. Cohen to make their donations to Beast Basketball.  These payments (and especially the payments from the SBA loan) bear no relevance at all to the conspiracy the Government chose to indict: that Mr. Cohen and Mr. Gilder allegedly defrauded either Mr. Parsons or Mr. Lee into transferring money to Beast Basketball in the first place.  This evidence should be precluded under Rule 401.

Alternatively, the evidence of the Lloyds' Beast Basketball Payments should also be precluded under Rule 403.  Because the allegations of the Lloyds' supposed defrauding of the SBA after Messrs. Parsons and Lee's monies were exhausted, and their selective embezzlement from Beast Basketball, relate at most to some other theoretical conspiratorial scheme(s) not charged in the Indictment, its admission would be unduly prejudicial even if there was some modicum of relevance.

To be clear, if anything, the Lloyds' Beast Basketball Payments would concern *separate* schemes for which there is no evidence that Mr. Cohen was involved and for which Mr. Cohen was not indicted.  Most problematically, the evidence of the Lloyds' improper spending of SBA

money would concern a wholly separate conspiracy centered on defrauding the federal government.  Stated differently, the Lloyds' Beast Basketball Payments from the monies obtained from the SBA (and not from Messrs. Parsons or Lee) "are not inextricably linked [to the alleged scheme], as they involve different parties and different types of transactions."  *United States v. Kurland*, 2022 WL 2669897, at *5 (E.D.N.Y. July 11, 2022) (excluding evidence), *aff'd*, 2024 WL 5165547 (2d Cir. Dec. 19, 2024).  Indeed, many of the SBA payments that the Government has identified occurred in 2021, well outside of the time period charged in the Indictment and well after *all* of the funds Mr. Cohen allegedly defrauded were dissipated by Beast Basketball.  *See United States v. Lyles*, 593 F.2d 182, 195 (2d Cir. 1979) (finding inadmissible evidence of uncharged conduct that occurred three years after the charged conspiracy).

Courts have been clear that an attempt to introduce evidence of an alleged "wholly separate fraudulent scheme" should be excluded because of risks of "confusing the jury and creating undue prejudice under Rule 403."  *United States v. Konstantinovskiy*, 2024 WL 3360379, at *6-7 (E.D.N.Y. July 10, 2024); *see Kurland*, 2022 WL 2669897, at *6 ("Introducing an entirely uncharged scheme involving different legal issues would create substantial and unfair prejudice, and would risk the jury confusing the issues").  In short, these "uncharged transactions" by the Lloyds have little, if any, probative value, are not "necessary to understand the charged transaction" against Mr. Cohen, and are "likely to divert the jury's attention from the charged transactions."  *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007).  Indeed, by introducing this inflammatory evidence, the jury would be improperly left with the indelible (yet false) impression that Mr. Cohen should bear some responsibility for the Lloyds' alleged defrauding of a government agency to purchase luxury items during the height of the COVID pandemic. *See United States v. Jackson*, 2021 WL 62109, at *2 (E.D.N.Y. Jan. 7, 2021) (evidence

of defendant's uncharged crime "is not directly tied to the 'overarching factual scenario' of the case, . . . [and] the danger of unfair prejudice is substantial" where the uncharged crime is "'more inflammatory than the charged crime'") (internal citations omitted).  The law is clear that just this type of evidence must be precluded.  *See, e.g.*, *United States v. Khan*, 591 F. Supp. 2d 202, 206 (E.D.N.Y. 2008) ("Upon weighing the probative value and risk of prejudice of admitting [] uncharged crimes, the court must preclude any uncharged conduct that is unduly prejudicial to such a defendant"); *United States v. Aguilar*, 2023 WL 3807731, at *1 (E.D.N.Y. June 2, 2023), *supplemented*, 2024 WL 759973 (E.D.N.Y. Feb. 22, 2024) ("the potential for prejudice from evidence of [an uncharged] scheme is significant . . .  especially true where, as here, the pilfered money was allegedly spent on luxury goods and alimony payments, expenditures that many jurors could see as particularly unsavory").

     *FRE 404(b)*.  For similar reasons, the uncharged Lloyd's Beast Basketball Payments are also not admissible as a prior act under Rule 404(b).  Rule 404(b) generally prohibits "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Such evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

     The Lloyds' expenditures of monies from Beast Basketball cannot be admitted under Rule 404(b).  For one, again, Mr. Cohen is not alleged to have had any involvement in the Lloyds' Beast Basketball Payments—and especially the payments associated with the SBA loan—so none of that conduct is *his* conduct; it is the Lloyds'.  The Government seems to try and get around that through its suggestion (made at the eleventh hour, and conspicuously only after the defense offered the Lloyds as potential defense witnesses) that the Lloyds are "unindicted coconspirators" of Mr.

Cohen.  But they are not.  The only relevant conspiracy alleged in the Indictment is as between

Mr. Cohen and Mr. Gilder and concerns defrauding *Messrs. Parsons and Lee* out of their money,

not defrauding the SBA or embezzling from Beast Basketball.  Indeed, there is not a shred of

evidence that the Lloyds are unindicted coconspirators in the wire-fraud conspiracy charged in the

Indictment.[3]  Tellingly, the Government's sole evidence as to how the Lloyds participated in any

alleged attempt to defraud Messrs. Parsons and Lee is effectively the mere fact that the Lloyds

served as officers in Beast Basketball, the entity that received the allegedly fraudulent donations

(*i.e.*, that they signed checks, authorized various transactions, and "knew that [Mr. Cohen] was

obtaining donations from Parsons and Lee" (without alleging the Lloyds had any knowledge those

donations were supposedly fraudulent)).  December 17, 2025, Gov't Letter at 4, 7.  But each of

those "allegations" are entirely innocuous, especially given the undisputed fact that Beast

Basketball was in fact a registered and active non-profit (as the Government acknowledges) that

spent funds legitimately.  Indeed, each of the foregoing actions identified by the Government are

actions that are taken by any leader of a legitimate non-profit.  To conclude from that evidence

that the Lloyds must have joined Mr. Cohen's alleged criminal conspiracy would thus effectively

mean that any non-profit leader (or any CEO, for that matter) engages in a criminal conspiracy

whenever anyone at their organization obtains money for the organization fraudulently.  That

cannot be and is not the law.

At bottom, the Government did not allege the Lloyds conspired with Mr. Cohen for a

simple reason: it could not credibly do so.  Conspiracy to commit wire fraud "requires a showing

---

[3] The Government all but concedes that any criminal exposure (there is none) for the Lloyds related to the transactions charged in the Indictment is entirely time-barred.  *See* December 17, 2025, Gov't Letter at 7-8.  The Government alleges that the only potential criminal exposure within the limitations period is based on payments made in September 2021 and in 2022, *id.*, but those payments, as the Government knows, are completely unrelated to the Athletes' donations: the 2021 and 2022 payments used monies obtained through the SBA loan, not the Athletes' Donations.  *Id.* at 5 (Government stating that the money from the Athletes' donations had dried up by July 2020).

that the defendant agreed with another to commit wire fraud and knowingly engaged in the conspiracy with the intent to commit that offense," *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024), and the Government has not even attempted to make such a showing with anything more than pure insinuation, *see United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989) ("[T]here must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.") (quotation marks omitted).

Regardless, even if the Lloyds and Mr. Cohen entered into some conspiracy to defraud the SBA (and there is not one ounce of evidence to that effect), the Government cannot show that that uncharged crime should be admitted under Rule 404(b). "[R]egarding the admissibility of the other uncharged acts or conduct under Fed. R. Evid. 404(b), and more specifically, uncharged evidence related to financial schemes, courts in [the Second] Circuit have stated that 'the government must explain the uncharged transactions, identify similarities between the charged and uncharged transactions, and articulate how the similarities identified support an inference of knowledge or intent.'" *United States v. Graham*, 2019 WL 2366724, at *6 (S.D.N.Y. May 31, 2019), *aff'd*, 51 F.4th 67 (2d Cir. 2022) (quoting *Stein*, 521 F. Supp. 2d at 270). The Government cannot do that here. As noted above, the allegations concerning the Lloyds' Beast Basketball Payments—and especially of defrauding the SBA—are wholly distinct from and more inflammatory than the allegedly fraudulent transactions in the Indictment. The theory in the Indictment is that Mr. Cohen committed wire fraud by failing to disclose certain transactions to his clients in violation of his duties as their investment advisor. The Lloyds' defrauding of the SBA much later during the height of the COVID pandemic would be categorically separate crimes, and should be admissible neither to establish Mr. Cohen's motive—since he had no knowledge of

them—nor to "complete the story of the charged crimes," *Kurland*, 2022 WL 2669897, at *5, since the Government's theory is that Mr. Cohen benefitted from the monies donated to Beast Basketball in one singular way: "building an athletic training facility in [his] backyard."  Indictment ¶ 25.

    ***Constructive Amendment***.  Finally, for similar reasons, were the Government to proceed on a theory at trial that Mr. Cohen conspired with the Lloyds to defraud Messrs. Parsons and Lee, defraud the SBA, and embezzle from Beast Basketball, it would effectuate a constructive amendment of the Indictment.  The Indictment, as the Court is aware, charged Mr. Cohen—but not the Lloyds—with only one conspiracy: conspiring with Mr. Gilder to commit wire fraud, *e.g.*, the alleged defrauding of Messrs. Parsons and Lee into making donations to Beast Basketball. Indictment ¶¶ 2, 25-30.  The Indictment does not include factual allegations about the Lloyds' involvement in that conspiracy, nor about any Beast Basketball payments other than the payments made to the gym allegedly in part to benefit Mr. Cohen.  And, most problematically, the Indictment *certainly* does not charge the Government's present theory that there was some conspiracy between Mr. Cohen and the Lloyds to defraud the SBA that allegedly occurred well after the period charged in the Indictment (and after all of Messrs. Parsons and Lee's funds were dissipated).  Indeed, it would be particularly problematic if the jury were left with the impression that Mr. Cohen had any role in a supposed conspiracy to defraud the SBA.  As the Government explains and as noted above, by July 2020, Beast Basketball had a negative account balance, reflecting the undisputed fact that Beast Basketball had used all of the monies donated to it by Messrs. Parsons and Lee (recall, the last such donation had occurred in October 2019, *see* Indictment ¶ 27).  The Government now claims (but did not allege), however, that Beast Basketball received a subsequent influx of $144,000 by way of a loan backed by the SBA, and that the Lloyds—not Mr. Cohen— made a series of payments on behalf of Beast Basketball representing the entirety of those

borrowed funds.  Of course, these payments—which stem from a completely different funding source and of which Mr. Cohen had no knowledge—are plainly irrelevant and totally distinct from any issue at trial involving Messrs. Cohen, Parsons, and Lee.  *See Konstantinovskiy*, 2024 WL 3360379, at *6-7.  At bottom, by trying to introduce evidence of the Lloyds' Beast Basketball Payments, it appears that the Government is attempting to broaden the Indictment to encompass an entirely separate conspiracy to defraud the SBA (or some sort of uncharged embezzlement conspiracy involving the alleged improper use of Beast Basketball payments for the benefit of the Lloyds.  If the Government is permitted to introduce this evidence, however, it would amount to a constructive amendment of the Indictment, which is a *per se* violation of the Fifth Amendment.  *See United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021); *see also United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 715 (S.D.N.Y. 2011) (considering the defendants' motion *in limine* as an anticipatory claim that the indictment will be constructively amended).

     "A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018), and, in this Circuit, may arise when "the proof at trial . . . so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment," *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (internal citation omitted).  The indictment must provide "notice of the core of criminality to be proven at trial," *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 310 (2d Cir. 2009) (per curiam) (internal quotation marks and emphasis omitted), which "involves the essence of a crime, in general terms," *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) (internal quotation marks omitted).

Plainly, here, the Indictment has failed to give Mr. Cohen notice of an uncharged conspiracy between Mr. Cohen and the Lloyds to defraud the SBA much later or embezzle from Beast Basketball. For all the reasons stated above, the uncharged Lloyds' Beast Basketball Payments are "based on a complex of facts distinctly different from that which the grand jury set forth in the indictment," *D'Amelio*, 683 F.3d at 419 (quotation omitted), including "the time, place, people, and object" of the alleged conduct, *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997) (quotation omitted): they involve unindicted people, concern different transactions from Messrs. Parsons and Lees' donations, have a distinct object, and occurred at distinct times—most of which occurred outside the time period alleged in the Indictment, *see* December 17, 2025, Gov't Letter at 5. *See, e.g.*, *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (finding constructive amendment where the indictment "charg[ed] [the defendant] with misbranding due to his repackaging of the drugs" but "the Government alleged that the drugs were misbranded because they were not sterile" at trial); *Wozniak*, 126 F.3d at 111 (finding constructive amendment where government introduced "evidence of narcotics other than what was alleged in the indictment"); *United States v. Zingaro*, 858 F.2d 94, 102-03 (2d Cir. 1988) (finding constructive indictment where proof at trial involved "illegal debt collections" separate from scheme alleged in indictment); *United States v. Mollica*, 849 F.2d 723, 729-30 (2d Cir. 1988) (finding constructive amendment where the indictment alleged tax fraud conspiracy but the proof at trial involved money laundering scheme, and emphasizing that the court must be "alert to subtle attempts to broaden the already pervasive and widesweeping nets of conspiracy prosecutions" (quotation marks omitted)).

This Court should preclude evidence of the Lloyds' Beast Basketball Payments. In the alternative, this Court must at the least preclude evidence of any of the Lloyds' Beast Basketball

Payments that occurred after July 2020 and were spent solely using SBA funds both as affirmative evidence or on cross-examination of the Lloyds.

## II.    <u>The Court Should Preclude Testimony from Michael Lutterloh</u>

Mr. Cohen moves to preclude in its entirety testimony from Michael Lutterloh, who appears to be the Chief Financial Officer and an Executive Vice President of Montage Financial Group ("Montage").  Montage is identified as "Broker-1" in the Indictment and is the company that purchased the life insurance policies at issue from the insureds and then sold those policies to Law Firm-1.  According to the Government, Mr. Lutterloh will testify about "life insurance policies and viatical life settlements, including testimony about how such life insurance products operate, are regulated, and are transacted."  *See* Ex. A, November 25, 2025, Non-Expert Witness Letter at 2.  Mr. Lutterloh's purportedly lay testimony must be precluded in its entirety for at least two reasons: (i) Mr. Lutterloh had no involvement in any of the Montage transactions at issue, and thus he has no basis to testify as a fact witness; and, (ii) regardless, the testimony from Mr. Lutterloh that the Government previews is just the type of "custom and practice" testimony and testimony about "regulations" that are routinely precluded from lay witnesses (and would be particularly inappropriate here).

*First*, although certain employees from Montage were involved in certain of the transactions at issue in the Indictment, the defense has a good faith basis to believe that Mr. Lutterloh did not himself have any personal involvement in any of those transactions.  Indeed, the 3500 material provided by the Government strongly suggests that Mr. Lutterloh had no familiarity with these transactions at all as of two weeks ago, December 8, 2025, when he met with the Government.  Specifically, at that time, Mr. Lutterloh asserted that he had never even "spoken" to Mr. Gilder, had only "[h]eard [his] name through this process," and that "[JBM] doesn't ring any bells."  *See* Ex. B, 12/8/2025 Trial Prep with M. Lutterloh at 3. Any testimony from Mr. Lutterloh

15

would therefore be irrelevant to whether Mr. Gilder or Mr. Cohen "fraudulently induced [Messrs. Parsons, Lee, or Holiday] to purchase viatical life insurance policies at massive markups, from which COHEN and GILDER secretly profited," Indictment ¶ 2.  Moreover, such testimony would neither be based on Mr. Lutterloh's "personal knowledge" to qualify as permissible fact testimony, Fed. R. Evid. 602, nor be "rationally based on the witness's perception" to qualify as a lay, rather than expert, opinion under Fed. R. Evid. 701(a).  *See United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (explaining that testimony is "rationally based on the witness's perception" where it is "both (a) based on the witness's first-hand perceptions and (b) rationally derived from those first-hand perceptions").  As stated in *Konstantinovskiy*, "[t]o the extent the government seeks to elicit testimony regarding specific misrepresentations and [transactions] in which the witness was not involved, however, that testimony would be permissible only as expert opinion testimony, because it would call for the witness to draw on his experience generally, rather than on his own 'personal perception' of the matter at issue." *Konstantinovskiy*, 2024 WL 3360379, at *19 (quoting *United States v. James*, 607 F. Supp. 3d 246, 259 (E.D.N.Y. 2022)).  The Court was clear that such a lay witness could only testify "based only on [his] experiences with matters pertinent to *this case*." *Id.* (emphasis added); *see also Armouth Int'l Inc. v. Fallas*, 2023 WL 6439920, at *1 (S.D.N.Y. Oct. 3, 2023) ("Of course, the lay witnesses (including Mr. Fallas) may only testify about the matters in suit: this transaction and any factual matters relevant to the reasonableness of reliance (the key issue in this case) that are known to the witnesses because they are percipient observers of the events in suit or the relationship between the parties").

Second, regardless, the testimony that the Government has previewed from Mr. Lutterloh is just the type of "custom and practice" testimony or testimony about "regulations" that are impermissible from a lay witness.

16

Testimony about how life insurance and viatical life settlements generally operate and are transacted is impermissible from a lay witness. As one court in the Circuit recently explained, "the Government fails to point to a case in this Circuit in which a court has permitted an employee to testify generally about the 'policies and practices of their employer[ ]' as a lay, rather than expert, witness." *Bradley*, 2022 WL 1708400, at *7. In *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004), the Second Circuit considered whether the district court erred in permitting lay testimony from a bank employee about whether certain transactions between the defendants comported "with the business community's understanding of normal, true, trade transactions between a buyer and seller" and "the concept of a 'trust receipt,' and how it works in the context of an international commercial transaction," *id.* at 180-81. The court held that "[t]he admission of this testimony pursuant to Rule 701 was error because it was not based entirely on [the witness's] perceptions; the District Court abused its discretion to the extent it admitted the testimony based on [the witness's] experience and specialized knowledge in international banking." *Id.* at 181. The court explained that although lay testimony may be permitted based on the witness's involvement in an internal investigation he undertook contemporaneously as a bank employee and therefore on his perceptions, "to the extent [the witness's] testimony was not a product of his investigation, but rather reflected specialized knowledge he has because of his extensive experience in international banking, its admission pursuant to Rule 701 was error." *Id.* at 181-82.

There is no indication that any conceivable testimony that the Government intends to elicit from Mr. Lutterloh will involve this type of internal investigation, nor will it reflect *any* first-hand knowledge of any of the transactions at issue in this case. Rather, the testimony described by the Government as relating to "life insurance policies and viatical life settlements, including testimony

about how such life insurance products operate . . . and are transacted" is the precise type of industry "custom and practice" evidence that is properly the province of expert, rather than lay, witness testimony.  Indeed, such testimony appears to plainly "reflect[] specialized knowledge [the witness] has because of his extensive experience in [the industry]."  *Bank of China* at 182.  District courts in this Circuit have repeatedly held that expert testimony is necessary for the introduction of this type of custom and practice evidence.  *See, e.g.*, *Bradley*, 2022 WL 1708400, at *7; *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 2010 WL 741971, at *4-5 (E.D.N.Y. Feb. 23, 2010) (discussing the difference between lay and expert testimony, and concluding that the latter is necessary when testimony extends beyond first-hand knowledge and includes custom and practice); *Helena Assocs., LLC v. EFCO Corp.*, 2008 WL 2117621, at *6 n.7 (S.D.N.Y. May 14, 2008) ("[A]s a lay witness, Rizzo may not testify regarding custom and practice in the construction industry."); *Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 171, 174 (D. Conn. 2005); *Didzbalis v. Sheridan Transp. Co.*, 2002 WL 31619071, at *1 (S.D.N.Y. Nov. 19, 2002) (collecting cases for proposition that "expert testimony is necessary for the introduction of custom and practice evidence"); *cf. Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 403 (S.D.N.Y. 2013) (collecting cases for proposition that "[i]t is of course common for testimony regarding the 'customs and practices' in a particular industry to be the subject of *expert* testimony" (emphasis added)); *Fidelity Nat. Title Ins. Co. v. Cole Taylor Bank*, 878 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (permitting witness to testify as *expert* to clarify title insurance industry terminology), especially in an industry as "technical and specialized," Fed. R. Evid. 701, as the viatical settlement one.

Even further afield is the Government's suggestion that Mr. Lutterloh will offer some testimony about certain undefined "regulations."  But it is entirely unclear how any "regulations"

pertinent to "life insurance policies [or] viatical life settlements" bear any relevance to the issues to be tried in this case. Indeed, Mr. Lutterloh himself (accurately) told the Government on December 8, 2025, that there are no regulations which govern the market at issue. Specifically, this case involves the resale of life insurance products on the secondary and tertiary markets, and Mr. Lutterloh himself made clear that there are no regulations governing those markets. Specifically, Mr. Lutterloh conveyed to the Government that "[t]he part that is regulated is getting the policy from the insured," *i.e.*, the *primary* market, and that "[o]nce you are on the secondary market you can do whatever," *i.e.*, there are no applicable regulations. And it is undisputed that the relevant allegedly fraudulent transactions at issue here—from Law Firm-1 to Messrs. Parsons, Lee, and Holliday—are not just *secondary* transactions, they are *tertiary* transactions. That is to say, there are three transactions at issue here: (i) the insureds sold their policies to Montage (the primary transaction); (ii) Montage then sold the policies to Law Firm-1 (the secondary transaction); and (iii) Law Firm-1 then sold the policies to Messrs. Parsons, Lee, and Holiday (the tertiary transaction). As Mr. Lutterloh stated, the primary transaction there between the insured and Montage is regulated and the subsequent ones are not. And this is not an academic or fine distinction: as Mr. Lutterloh himself also made clear, the reason that the *primary* market is regulated is because "the state is worried about getting the policy from the insured." But once the insured no longer has the policy—*i.e.*, when it is being sold on the secondary or tertiary markets— the animating purpose behind those regulations disappears entirely. Thus, as Mr. Lutterloh's own statements reveal, there are no relevant regulations of which he can testify. (And, of course, testimony about any regulations concerning "getting the policy from the insured" would not just be irrelevant, but significantly prejudicial.)

Regardless, even were there any relevant applicable regulations for Mr. Lutterloh to testify

about (there are not), the law is clear (as noted above) that such testimony about the state of the law or regulations is impermissible from a lay witness, since it would necessarily be based on "specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *see also Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004). Further, "neither expert nor lay witnesses may present testimony in the form of legal conclusions," *Davis v. City of New York*, 959 F. Supp. 2d 427, 435 (S.D.N.Y. 2013) (quotation marks omitted); *see Cameron v. City of New York*, 598 F.3d 50, 62 n.5 (2d Cir. 2010) ("[T]he impropriety of allowing a lay witness to testify in the form of a legal conclusion is all the clearer."), and, as a "general rule," even "an expert's testimony on issues of law is inadmissible [sic]," *United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991) (excluding opinion of former director of SEC's Division of Corporate Finance about meaning of language appearing on SEC disclosure "because it related directly to the issue of whether [defendant]'s . . . disclosures complied with the legal requirements" and therefore "would have constituted an impermissible instruction on governing law"); *see also United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (holding that expert's statements that defendants violated securities laws were legal conclusions that "went well beyond his province as an expert"), *modified on other grounds*, 856 F.2d 5 (2d Cir. 1988); *Amley v. Sumitomo Mitsui Banking Corp.*, 2020 WL 8514825, at *3 (S.D.N.Y. Dec. 8, 2020) ("It is well-settled in this Circuit that expert opinions as to the interpretation and application of domestic law are inadmissible." (quotation marks omitted)); *Securities and Exchange Commission v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (excluding opinions that "improperly invade[ ] both the province of the judge to instruct on the law and the jury to find the facts").

As an exception to this general rule, courts may "permit ***experts*** to testify about regulatory frameworks, rules, purposes, and background," *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp.

3d 363, 391 (S.D.N.Y. 2024) (emphasis added)—but the critical term there is "*expert*," *see, e.g.*, *Bilzerian*, 926 F.2d at 1294-95 (upholding admissibility of expert's testimony about "general background on federal securities regulation and the filing requirements of Schedule 13D" and explaining that "[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *In re Elysium Health-ChromaDex Litigation*, 2022 WL 421135, at *23-25 (S.D.N.Y. Feb. 11, 2022) (allowing expert in false advertising action concerning dietary supplements to provide "an overview of the relevant FDA regulations" and to trace "the statutory and regulatory background"). Simply put, a lay witness like Mr. Lutterloh cannot testify about "regulations"—whatever that might mean—because that testimony is the proper province of either expert testimony or the Court's instruction. Nor is it apparent what the relevance of the regulations is to any issue at trial.

III.    <u>The Court Should Preclude Testimony from Peter Melley</u>

In its December 17, 2025, witness disclosure, the Government identified a lay witness named Peter Melley. As far as the defense can tell, Mr. Melley is an attorney at the Financial Industry Regulatory Authority ("FINRA") who appears to serve regularly as a retained expert witness.[4] Although unlike with its other "Non-Expert Witnesses," the Government has not disclosed the purported subjects of Mr. Melley's potential lay testimony, the 3500 material it provided suggests Mr. Melley plans to testify "about fiduciary responsibilities, investment adviser, series exams, disciplinary infractions, continuing education requirements," and "can testify about the 5% rule, and the umbrella anti-fraud rules in the 2100 series." For all the reasons stated above, however, these are nearly paradigmatic topics that require expert testimony. *See, e.g.*, *Bank of China*; *see also supra* at 17-18. Mr. Melley—a deeply experienced attorney at FINRA—would

---

[4] https://expertwitnessprofiler.com/expert-witness/Peter-Melley/1560051

undoubtedly rely on his "specialized knowledge" to testify about things like "fiduciary responsibilities," FINRA's supposed "5% rule," and the apparent "umbrella anti-fraud rules in the 2100 series." In light of the foregoing, Mr. Melley should be precluded entirely from testifying at trial.

In the alternative, Mr. Melley's testimony should be exceedingly circumscribed. He should not be entitled to offer any explanation, analysis, or opinion about any of the supposed FINRA policies, regulations, and guidance that he referred to in his communications with the Government. Further, Mr. Melley should be precluded from offering any opinions on facts or issues that are at issue in the trial. Indeed, because Mr. Melley has never met Mr. Cohen and was not in any way involved in any of the underlying transactions or facts at issue in this case, his testimony must be limited at most to testimony of his *own* "perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." For just one example, even if Mr. Melley is permitted to testify about fiduciary duty rules or FINRA's supposed "5% rule" (and he should not), he should in no way be able to testify as to whether those rules even apply to the transactions at issue or to Mr. Cohen's conduct (let alone, of course, whether those rules were violated).

## IV. The Government has Represented that It Does Not Intend to Seek to Introduce Mr. Cohen's Text Messages █████████████████████████████████████ ██████████

The Government has informed the defense that it is not planning on introducing text messages of Mr. Cohen's ████████████████████████. On that representation, the defense does not currently move to exclude that evidence.

## V. The Government has Represented that It Does Not Intend to Seek to Introduce Any Evidence Relating to the Charges Brought Against Charles Briscoe and Calvin Darden

The Indictment charged Messrs. Briscoe and Darden with conspiracy to commit wire fraud

and wire fraud, and Mr. Briscoe with aggravated identity theft.  On the Government's consent, Mr.

Cohen's trial was severed from Mr. Darden's trial on February 21, 2024.  The defense understands

that the Government is not intending on introducing any evidence related to these schemes, but, to

the extent that the Government's position changes, the defense will move to exclude that evidence.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court grant each of its

motions *in limine*.

Dated: New York, New York
      December 22, 2025

Respectfully submitted,

Michael L. Bloch

BLOCH & WHITE LLP
Michael L. Bloch, Esq.
Benjamin D. White, Esq.
Cristina Alvarez, Esq.
90 Broad Street, Suite 703
New York, NY 10004
(212) 901-3820
bwhite@blochwhite.com
mbloch@blochwhite.com
calvarez@blochwhite.com

MANCINI SHENK LLP
Mark Sedlander, Esq.
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
(424) 652-4016
msedlander@mancinishenk.com

*Counsel for Darryl Cohen*