UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

       v.

DARRYL COHEN,

        *Defendant*.

No. 23-cr-134 (VSB)

## **DEFENDANT DARRYL COHEN'S OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

MICHAEL L. BLOCH, ESQ.
BENJAMIN D. WHITE, ESQ.
CRISTINA ALVAREZ, ESQ.

BLOCH & WHITE LLP
90 Broad Street, Suite 703
New York, NY 10004
(212) 901-3820

MARK SEDLANDER, ESQ.

MANCINI SHENK LLP
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
(424) 652-4016

*Counsel for Darryl Cohen*

To: JAY CLAYTON, ESQ.
    United States Attorney
    Southern District of New York
    26 Federal Plaza, 37th Floor
    New York, New York 10278
    *Attn: Brandon C. Thompson*
    *Kevin B. Mead*
    *William Kinder*
    *Assistant United States Attorneys*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ........................................................................................................ 2

ARGUMENT ....................................................................................................................... 4

I.  The Court Should Preclude the Government's New and Unindicted Theories of Fraud as to Beast Basketball [Resp. to Gov't Mot. at 7 n.4] ..................................................... 4

    A.  Background ........................................................................................................... 5

    B.  The Government's New Theories as to Beast Basketball Would Be Unconstitutional Constructive Amendments and Must Be Precluded.................................................. 8

II. The Court Should Deny the Government's Request to Admit Mostly Unidentified "Various Statements" the Government Argues Are Not Subject to the "Hearsay Rule" [Resp. to Gov't Mot. § I]........................................................................................................... 17

    A.  The "Baseball Player's" (Nyjer Morgan) Complaints Should Be Excluded as Irrelevant Hearsay Because There is No Evidence That They Had Any Effect on the Listener [Resp. to Gov't Mot. § I.B.1] ..................................................................................... 18

    B.  Statements of Mr. Cohen's Supposed Co-Conspirators Should Not be Admitted At This Point [Resp. to Gov't Mot. § I.B.2] ..................................................................... 19

    C.  Statements of Mr. Cohen's Supposed Subordinates Should Not be Admitted At This Point [Resp. to Gov't Mot. § I.B.3] ..................................................................... 20

    D.  Statements of Mr. Cohen's Attorneys Should Not Be Admitted at This Point [Resp. to Gov't Mot. § I.B.4] ..................................................................................... 22

████████████████████████████████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████████████

IV. The Court Should Not Admit Evidence of Certain of Mr. Cohen's Alleged Prior Conduct Identified by the Government [Resp. to Gov't Mot. § III]................................................. 35

    A.  The Court Should Not Admit Evidence of Mr. Cohen's Federal Tax Returns [Resp. to Gov't Mot. § III.B.1]........................................................................................... 36

    B.  The Court Should Not Admit Evidence of "Claims of Fraud by the Baseball Player" [Resp. to Gov't Mot. § III.B.2] ................................................................................... 37

    C.  The Court Should Not Admit Evidence of Mr. Cohen's Supposed Violations of Morgan Stanley and FINRA Policies [Resp. to Gov't Mot. § III.B.3]................................ 40

D.    The Court Should Not Admit Evidence of a Purported "Investigation" by Morgan
Stanley [Resp. to Gov't Mot. § III.B.4] .............................................................. 43

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

G.    The Court Should Not Admit Evidence of the "Concerns" That Jrue Holiday's Wife
and Her Mother Supposedly Had About Mr. Cohen [Resp. to Gov't Mot. § III.B.7] .......... 45

H.    The Court Should Not Admit Evidence of Decades' Old and Unsubstantiated "Prior
Allegations of Fraud by Other Athlete Clients" [Resp. to Gov't Mot. § III.B.8] ................ 48

CONCLUSION ........................................................................................................... 51

## **INTRODUCTION**

In its lengthy motions *in limine* ("Gov't Mot."), the Government seeks to effectively rewrite the Indictment while also asking for indefensible rulings that would transform a discrete wire fraud trial into a sprawling post-mortem of Darryl Cohen's entire professional career. The new legal theories and factual allegations would result in a trial wholly untethered from the specific criminal conduct that the Government charged. This Court should nip the effort in the bud and deny nearly each of the Government's requests in full.

Casting a far broader net than the Fifth Amendment permits, the Government begins its motion by construing the claims at issue in the case to sweep in new alleged victims, new coconspirators, and, most problematically, an entirely new theory of fraud that is repugnant to the Indictment. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But an unbroken line of binding authority makes clear the defense must be allowed to question Mr. Parsons on these texts. Next, the Government tries to pile on layer upon layer of inadmissible propensity and hearsay evidence, in an overt effort to make the jury think Mr. Cohen is a bad guy. For example, the Government asks to bury the jury in no fewer than three unsubstantiated client complaints lodged with the Financial Industry Regulatory Authority ("FINRA")—two of them dating back more than fifteen years—and ambiguous "concerns" that an alleged victim's spouse's mother had about the amount of administrative fees Morgan Stanley charged on one of her accounts that Mr. Cohen managed. What's more, the Government seeks to introduce each of these various client complaints without calling the complainants to testify, a blatant violation of hearsay rules and basic fairness. Elsewhere threaded within the Government's 62-page brief are other similar requests to admit

1

irrelevant trivial hearsay, several of which consist of requests to admit broad categories of material without even identifying what the actual evidence is the Government wants admitted.  The Court should deny those requests.

In short, a trial about narrow issues of alleged fraud—whether, for instance, Mr. Parsons did or did not authorize donations he made to the non-profit Beast Basketball—risks devolving into a wide-ranging collateral inquiry into things the grand jury never remotely considered and which Mr. Cohen could not possibly have prepared for.  On both evidentiary and constitutional grounds, the Court should exclude the Government's evidence and arguments.

## LEGAL STANDARDS

Only relevant evidence is admissible.  *See* Fed. R. Evid. 402.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."  Fed. R. Evid. 401(a)-(b).  Under FRE 403's balancing test, relevant evidence may nonetheless be excluded by the Court "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  "Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  Rule 403 is concerned with "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence."  *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995).

Under Rule 404(b),"[e]vidence of [a] crime, wrong or . . . act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," Fed. R. Evid. 404(b)(1), but it "may be admissible for another purpose, such

2

as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2).  To be admissible, evidence of prior bad acts must be (1) introduced for a proper purpose, (2) relevant to the charged offense, (3) not substantially more prejudicial than probative, and (4) admitted with a limiting instruction if requested.  *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007).  The Government must identify "some similarity or tangible connection between the acts[,] . . . something that makes the prior act relevant to proving the contested fact."  *United States v. Edwards*, 342 F.3d 168, 177 (2d. Cir. 2003).  "If the government cannot identify a similarity or some connection between the prior and current acts, then evidence of the prior act is not relevant to show knowledge and intent."  *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002).

The Confrontation Clause of the Sixth Amendment "provides two types of protection for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). "[T]he right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable."  *Id.*  The court "***must*** allow some cross-examination of a witness to show bias," *United States v. Abel*, 469 U.S. 45, 50 (1984) (emphasis added), and the Confrontation Clause is violated where the defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness," *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).

## ARGUMENT

### I.    The Court Should Preclude the Government's New and Unindicted Theories of Fraud as to Beast Basketball [Resp. to Gov't Mot. at 7 n.4]

Before addressing the specific evidentiary arguments proposed by the Government's submission, we are required to address a significant statement largely snuck into a footnote in the Government's brief.  *See* Gov't Mot. at 7 n.4.  Specifically, by way of Footnote 4, the Government, for the first time since this case was filed nearly three years ago, attempts to preview a wholly new theory of wire-fraud liability, and one contradicted by the plain language of the Indictment and not remotely considered by the grand jury: that *even if* Messrs. Parsons and Lee were aware of, and authorized, donations to Beast Basketball, Mr. Cohen could still be convicted of wire fraud for failing to disclose to them the specifics of how that money would be spent (*e.g.*, for the benefit of Mr. Cohen's children and "associates").  This eleventh-hour theory is a brazen attempt by the Government to constructively amend the Indictment beyond anything the grand jury considered.  As this Court well knows, the Government's case about Beast Basketball has always been—and the grand jury only indicted—a theory that Messrs. Parsons and Lee did not authorize or know about the transactions to Beast Basketball *at all*.  An alternative theory that they *did* authorize those transactions, but did so based on Mr. Cohen's omissions or misrepresentations about how the money would be spent, is not just a totally different theory, it is logically inconsistent with the theory that was presented to and indicted by the grand jury.  In short, if Messrs. Parsons and Lee did not *know about* the transfers to Beast Basketball, they could not have been misled about how the transferred money would be spent.  This broadening of the Indictment cannot be countenanced by the Fifth Amendment.  Although Mr. Cohen had no inclination that the Government would seek to proceed on this unindicted and totally improper theory (and thus did not know to move to

dismiss it or preclude it in his motions *in limine*), Mr. Cohen respectfully points out that this Court must squarely preclude the Government from arguing or offering any evidence as to this new and inconsistent fraud theory.

At bottom, the Government is scrambling due to an unavoidable truth: as this case developed, the facts the Government used to secure an indictment in this case turned out to be false.  Contrary to the evidence presented to the grand jury, and contrary to Mr. Parsons's unequivocal statements to the Government, the evidence is overwhelming that he and Mr. Lee knew about and authorized transfers to Beast Basketball.  The Government's choices are now to either to proceed on that theory nevertheless or drop it all together.

## A. Background

As the Court is aware from the Indictment and dozens of filings in this case, the Government's theory as to Beast Basketball has always been that Mr. Cohen diverted Messrs. Parsons's and Lee's funds to the organization without their knowledge or authorization, *i.e.*, a secret misappropriation theory.  Most importantly, this factual allegation and theory were what the Government presented to the grand jury to secure the Indictment in this case.  In FBI Special Agent Melissa Baccari's testimony before the grand jury, the Government asked: "And what did Chandler Parsons and Courtney Lee say when law enforcement interviewed them about whether they had ever knowingly donated money to Beast Basketball?"  Special Agent Baccari responded in no uncertain terms: "Both Parsons and Lee said ***they never knew they were donating to Beast Basketball***." Ex. A at 12:3–7 (emphasis added).  What's more, Special Agent Baccari later testified that Mr. Parsons *first learned* about Beast Basketball by means of a text message conversation with Mr. Cohen in October 2020, *more than a year* after Mr. Parsons's last donation to Beast Basketball (in September 2019).  On this, Special Agent Baccari was clear, testifying with

reference to that text exchange that, "[a]t a certain point, [] Chandler Parsons learn[ed] that he allegedly donated a bunch of money to Beast Basketball." *Id.* at 15:8–11; Ex. A at 15:12–16:2 (referring to October 2020 text exchange, and Special Baccari stating that she had "reviewed chats where Parsons and Cohen are talking right after he learns that"). The theory in the grand jury was thus unmistakable: Mr. Parsons claimed that the first time he ever learned about Beast Basketball— or that he had donated to it—was well *after* his donations had ended.

That was precisely the basis on which the grand jury indicted Mr. Cohen, which is unambiguously reflected in the Indictment. In its overview of the alleged scheme, the Indictment alleges that Mr. Cohen "fraudulently diverted from the accounts of Athletes-2 and -3 approximately $500,000 in purported donations to a non-profit organization, ***without the knowledge of Athletes-2 and -3***, a large portion of which was used to build athletic training facilities in COHEN's backyard." Indictment ¶ 2 (emphasis added). Later, when alleging specific facts about Beast Basketball, the Indictment states clearly:

> Financial Institution-1's records reflect that Athletes-2 and -3 verbally authorized the transfers and that, on or about February 18, 2019, Athlete-2 signed a document purporting to permit transfers to Non-Profit-1 based on verbal authorization alone. ***In truth and in fact, however, Athletes-2 and -3 never authorized <u>any</u> such transfers***.

*Id.* at ¶ 28 (emphases added).

This allegation—that Messrs. Parsons and Lee were neither aware of nor authorized any of the Beast payments—has been an unbroken constant throughout this case. In his first interview with the Government, Mr. Parsons stated that "he had never heard of, or discussed, BB with COHEN." Ex. B at 5. Throughout pretrial litigation, the Government has reaffirmed the secret misappropriation theory articulated in the Indictment. For example, in its opposition to the defense's motion to dismiss submitted on February 21, 2025, the Government could not have been

clearer when reciting the factual allegations of the Indictment that it was relying on a secret misappropriation theory, which it clarified twice: "the athletes did not in fact authorize any such [Beast Basketball] transfers." Gov't Opp'n Mot. Dismiss, Dkt. 260 at 3; *see also id.* at 30 n.10 ("The Government also notes that it expects at trial to prove that [Mr. Parsons] first became aware that he was a victim of the fraud scheme when he learned of the fraudulent non-profit transfers[.]"). It is simply indisputable that the Government's theory has always been that Mr. Cohen secretly diverted monies out of the accounts of Messrs. Parsons and Lee without their awareness and provided it to Beast Basketball.

Now, however, for the first time, the Government buries a novel and alternative theory of liability in a footnote. Specifically, the Government now suggests that it wants to pursue the alternative theory, that, "if the defendant were correct that" Messrs. Parsons and Lee actually "were aware that they donated to a basketball charity called Beast Basketball," it was still fraudulent:

> The Government understands that the defendant intends to contest at trial whether Athlete-2 and Athlete-3 were aware that they donated to a basketball charity called Beast Basketball. To be clear, ***even if the defendant were correct about that fact—and he is not— he still committed fraud because he failed to disclose that the money was going to build a gym in his own backyard and that it was going to fund the basketball aspirations of the defendant's Children***.

Gov't Mot. at 7 n.4 (emphasis added). Elsewhere, the Government suggests—although it is difficult to parse—that Mr. Parsons may have relied on Mr. Cohen's representation that the Beast Basketball donations were helping "future [basketball] prospects" and "underprivileged kids." Gov't Mot. at 8.

To be clear, this is a brand new and totally distinct theory of wire-fraud liability: that even if Messrs. Parsons and Lee were aware of, and in fact authorized, the Beast donations, Mr. Cohen committed fraud in a different way, either (a) by omitting information about how the money would

be used, *i.e.*, an undisclosed use theory; or (b) by making an affirmative but false representation that the money was helping prospects and unprivileged kids, *i.e.*, an affirmative misrepresentations theory.  In other words, the Government is now arguing that Mr. Cohen could be convicted of fraud even if Messrs. Parsons and Lee wholly abandon their earlier allegations—and those contained in the Indictment and approved by the grand jury—and testifies that they were aware of and authorized some (or even all) of the Beast Basketball donations but did not know exactly what Mr. Cohen and his children were doing with those donations.  These new theories are utterly inconsistent with the Indictment, were not presented to or authorized by the grand jury, and must not be introduced at trial.

### B.  The Government's New Theories as to Beast Basketball Would Be Unconstitutional Constructive Amendments and Must Be Precluded

The Government's new theories are a transparent attempt to broaden the Indictment, a *per se* violation of the Fifth Amendment's Grand Jury Clause, which guarantees that once a grand jury indicts a defendant, the "charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 216 (1960).  A constructive amendment occurs when "the proof at trial . . . so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment."  *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 1998).  Although the Government is afforded some flexibility in proof, the indictment must give the defendant "notice of the core of criminality to be proven at trial."  *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (quotation marks omitted).

Supreme Court and Second Circuit precedent have delineated the boundaries between a permissible, non-prejudicial variance, on one hand, and an unconstitutional constructive

amendment of the indictment, on the other.  To be sure, the evidence at trial may sometimes permissibly "*narrow[]* the indictment's charges without adding any new offenses," *United States v. Miller*, 471 U.S. 130, 138 (1985) (emphasis added), but the indictment "may not be broadened," *Stirone*, 361 U.S. at 216.  Consistent with the principle that the Government is afforded flexibility of proof, there is no constitutional problem where there are minor factual variances from the indictment's allegations, so long as the changes between "indictment and proof" were relatively "minor" and "*de minimis*," *United States v. Davis*, No. 13-CR-923, 2017 WL 3328240, at *33 (S.D.N.Y. Aug. 3, 2017); *see, e.g.*, *United States v. Dupre*, 462 F.3d 131, 140–42 (2d Cir. 2006) (no constructive amendment where indictment alleged $2,000 transfer from *Irving, Texas*, but proof at trial concerned $2,000 transfer from *Liberty Township, Ohio*); *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (same where indictment identified only the Internet as a facility of interstate commerce to commit the crime, but the jury instructions listed both the Internet and telephone); *United States v. Danielson*, 199 F.3d 666, 668, 670 (2d Cir. 1999) (same where indictment specified *rounds* of ammunition, while the jury instructions permitted the jury to convict if the defendant transported the *component parts* of a round of ammunition).

Consequently, if "trial evidence [] 'amend[s]' the indictment by broadening the possible bases for conviction from that which appeared in the indictment," the defendant's Fifth Amendment rights will be violated.  *Miller*, 471 U.S. at 138 (citing *Stirone*, 361 U.S. at 213).  This principle applies both to new *facts* and new *theories*, and applies even where the operative criminal statute could, if properly pleaded by the indictment, encompass that new trial theory.  In *Stirone*, for example, the Supreme Court found a constructive amendment where the indictment alleged that the defendant obstructed *sand* shipments, but argument at trial charged interference with *steel* shipments—both theories advanced under the same statute, the Hobbs Act, which prohibits

unlawful interference with interstate commerce.  361 U.S. at 213–14, 217–18 (citing 18 U.S.C. §

1951).  Similarly, in *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005), the indictment alleged

that the defendant violated 21 U.S.C. § 352 and specified that to meet the statute's "misbranding"

element, the defendant had misbranded the drugs "due to his repackaging of" those drugs, *id.* at

64–65.  But, at trial, the Government argued that the defendant had "misbranded" the drugs

because "they were not sterile," which was a distinct but generally cognizable legal theory under

the same statute.  *Id.*  at 65.  In this context, the Second Circuit held, the Government had

constructively amended the indictment by introducing a new legal theory.[1]  *Id.*  And, in *United*

*States v. Wozniak*, 126 F.3d 105 (2d Cir. 1997), even though the possession-of-controlled-

substances statute could apply equally to possession of cocaine, methamphetamine, and marijuana,

the Second Circuit found a constructive amendment where trial evidence and the jury instructions

concerned marijuana, which was not charged in the indictment, *id.* at 109–110; *see also Roshko*,

969 F.2d at 4–6 (finding constructive amendment where indictment charged defendants with

conspiracy to change the immigration status of "an alien," but the proof at trial involved two

"aliens"); *United States v. Mollica*, 849 F.2d 723, 725, 729 (2d Cir. 1988) (finding constructive

amendment where jury was allowed to consider purported money laundering activity as part of

charged tax fraud conspiracy but "it was not established that [the money laundering scheme] was

included in the original indictment"); *cf. United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir.

1994) (finding no constructive amendment but explaining that an indictment is constitutionally

"broadened," where something "new [is] added to [the defendant's] indictment," such as "a new

victim" or a "new theory").

---

[1] Importantly, the Second Circuit has at times stated that a constructive amendment may arise even where only the
proof at trial, but not the jury instructions, alters an essential element of the charge.  *See Salmonese*, 352 F.3d at 620
(stating that a "defendant must demonstrate that ***either*** the proof at trial ***or*** the trial court's jury instructions so altered
an essential element of the charge . . . ." (quotation marks omitted and emphases added)).

Consistent with this overwhelming and clear precedent, district courts in this Circuit have also found constructive amendments where the Government introduces a new theory, not charged in the indictment at trial. In *United States v. Davis*, for example, a wire-fraud and wire-fraud conspiracy case, Judge Preska found a constructive amendment of the indictment where the Government introduced distinct "factual complexes" or "theories" at trial, both as to the theory of liability and economic harm. 2017 WL 3328240, at *31–35. And, in *Sakoc*, the district court found a constructive amendment where, during summation, "counsel for the government referred to additional false statements . . . [that] are not described in the Indictment." 115 F. Supp. 3d at 484. As the court explained, "[t]he government's new theories in closing were not included in the Indictment and therefore broadened the possible bases for conviction." *Id.* at 485. Thus, a constructive amendment occurs "when the government alleges one theory of the case in the indictment but argues another at trial," *Davis*, 2017 WL 3328240, at *28 (collecting cases), and the doctrine "prohibits the government from changing its approach midstream to rely on theories or evidence of which the indictment contained insufficient notice." *Sakoc*, 115 F. Supp. 3d at 483 (citation omitted).

Finally, in a fraud and conspiracy cases such as this one, the Second Circuit has instructed that courts have a "special responsibility" to be "vigilant" as to constructive amendment, *United States v. Roshko*, 969 F.2d 1, 4-5 (2d Cir. 1992), and "must be especially alert to subtle attempts to broaden the already pervasive and widesweeping nets of conspiracy prosecutions," *Mollica*, 849 F.2d at 729 (internal quotations and citation omitted) (constructive amendment where proof at trial concerned fraudulent scheme not encompassed by indictment); *see Davis*, 2017 WL 3328240, at *35 n.38 (stating "that the risk of surprise is particularly acute in fraud prosecutions" under 18 U.S.C. §§ 1343, 1349). Indeed, "[i]n light of the current broad range of conduct covered by the

11

federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury." *Mollica*, 849 F.2d at 729 (citation omitted).  Thus, the Second Circuit has cautioned that "[i]n order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial."  *Id.* (citation omitted).

Pursuant to the foregoing authorities, the Government's new theories in the indictment—that ***even if*** Messrs. Parsons and Lee authorized the donations to Beast Basketball it still constitutes fraud if Mr. Cohen omitted certain details of where the monies would be spent or affirmatively lied about same—are patently improper.  In particular, the Government now claims that it is wire fraud if Mr. Cohen did not disclose to Messrs. Parsons and Lee that his children were also participants in Beast Basketball, even if Messrs. Parsons and Lee knowingly donated the money. The relevant question is whether the Indictment put the defense on notice of the Government's new theories and the factual allegations that underpin them.  *See Rigas*, 490 F.3d at 229.  Based on the foregoing principles, it plainly did not for a single straightforward reason: the Indictment's allegations are fundamentally inconsistent with the Government's new Theories.  This is best demonstrated in two ways: (i) the Government's new *theories* are not contained within the Indictment; and (ii) the *facts* the Government relies upon for these new theories are also not in the Indictment.

*First*, the Government's new theories are not only absent from the Indictment, they are definitionally repugnant to the theory that *is* in the Indictment. As explained above, both the evidence presented to the grand jury and contained within the Indictment itself allege that Messrs.

Parsons and Lee had no knowledge of, and did not authorize, the Beast Basketball donations at all. *See* Indictment ¶¶ 2, 28; Ex. A.  This is a very discrete theory of fraud—that Mr. Cohen allegedly stole Messrs. Parsons and Lee's money without their knowledge.   The Government's new alternative theory would allow Mr. Cohen to be convicted of fraud "even if" Messrs. Parsons and Lee *did* authorize these transactions on the new theory that Mr. Cohen omitted other material information from the complainants (like the fact that Mr. Cohen's children also participated in the non-profit's activities, or the fact that the founders of the non-profit spent the money in ways that were both unforeseeable and unforeseen by Mr. Cohen). Not only is this a totally different type of fraud, it is necessarily inconsistent with the theory that was presented in the Indictment.   Either Messrs. Parsons and Lee did not authorize any of the transactions to Beast Basketball and Mr. Cohen effectuated them regardless, as the Indictment unambiguously alleges, or they did authorize the transactions and were unaware of where the monies were flowing—*both* cannot be true.   There simply can be no dispute that the Government's new theories are *alternatives* to the theory alleged in the Indictment.   And although the Government is permitted to plead alternative theories *within an indictment*, *see United States v. Astolas*, 487 F.2d 275, 280 (2d Cir. 1973), it most certainly may not omit an alternative theory from the indictment and try to make the case for it at trial regardless, *see infra*.

*Second*, in any event, the facts on which the Government's new theories rely are nowhere identified in the Indictment.  The Government's new theory that Mr. Cohen could be convicted of fraud even if Messrs. Parsons and Lee authorized the donations but were not told that the money "was going to fund the basketball aspirations of the defendant's Children" is a particularly brazen and prejudicial expansion. There is no remote mention of Mr. Cohen's children anywhere in the Indictment, either expressly or by any implication.  Nor is there a reference to any of the facts that

would support the Government's new so-called "slush fund" theory, that Beast Basketball was used to spend money on luxury items.[2]  Indeed, a review of the Government's exhibit and witness list shows that the Government is trying to inundate the trial with nefarious implications about every dollar that Beast Basketball spent.  In fact, in its opposition to the defense's motions *in limine*, the Government has made it clear that it will be pursuing this slush fund theory in its case at chief, now expanded to encompass allegations that Beast Basketball benefitted "the defendant, his children, and **his associates**."  Gov't Opp. at 2.  The defense has never been on notice of—and in fact never prepared for—that sort of trial.

*     *     *

In light of the foregoing, there can be no dispute that the Government's new theories would "broaden[] the possible bases for conviction," *Miller*, 471 U.S. at 138, by sweeping in factual allegations and theories beyond those charged in the Indictment, *see United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (distinguishing theories of wire fraud).  In sum, the Government's new theories fail to "comport with [the Indictment's] particulars," *Farr*, 536 F.3d at 1181, and necessarily rely on facts other than, and contradictory to, those contained in the Indictment, *see Budd*, 496 F.3d at 522.  This is *precisely* the constitutional issue that the constructive amendment doctrine polices: as it bears repeating, the Government cannot "allege[] one theory of the case in the indictment but argue[] another at trial."  *Davis*, 2017 WL 3328240, at *28;

To be clear, the Government's motion *in limine* alerting Mr. Cohen to this new theory—albeit largely buried in a footnote—does not cure the constructive amendment problem.  The constructive amendment doctrine is not merely concerned with notice or unfair surprise, although

---

[2] The Government is now claiming that Beast Basketball is not a legitimate charity, which is not alleged in the Indictment.  Perversely, the Government claims that if the defense seeks to rebut this argument, it will seek to admit evidence of how funds from a loan from the Small Business Administration were a spent—nearly a year after Mr. Parsons's last donation.  The Court should exclude this evidence and argument.

14

it does safeguard both: instead, it enacts the fundamental constitutional right under the Fifth Amendment that a defendant "be tried only on charges presented in an indictment returned by a grand jury." *Stirone*, 361 U.S. at 217.  In other words, a defendant may not be tried except on the "offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."  *Id.* at 218.  For that reason, a constructive amendment of the indictment is a structural error, not subject to harmless-error review, and a *per se* violation of the Fifth Amendment.  *Roshko*, 969 F.2d at 5–6.  The Government cannot unilaterally broaden this Indictment—only a group of Mr. Cohen's fellow citizens may.  And here, Mr. Cohen's fellow citizens in the grand jury did not have before them these newfound theories of criminality or the factual allegations supposedly supporting them; instead, they were presented with the unqualified allegation that "[b]oth Parsons and Lee said they never knew they were donating to Beast Basketball."  Ex. A at 12:6–7.  Because the grand jury only indicted a theory that Mr. Cohen secretly stole funds from Messrs. Parsons and Lee without their knowledge, the Government cannot now tell the petit jury an alternative theory.

Even were this not a structural issue (it is), the prejudice to Mr. Cohen of allowing this theory to be presented at trial is both apparent and abundant.  An entirely new and distinct theory of criminal liability requires a distinct investigation and trial strategy—not one that can be thrown together lightly less than a month before a four-week trial.  Further, were the defense on notice of these new theories—the Indictment provided none—it likely would have moved to dismiss them.[3]

---

[3] Although the defense was not on notice of this theory in order to litigate this issue, there is substantial question whether the new theory that the players were not told that the money would be spent (in part) to benefit Mr. Cohen's children would even state a claim under the wire fraud statute. If money is knowingly donated to a non-profit organization, does it become criminal wire fraud if the non-profit spends that money in a way that also has an incidental undisclosed benefit for the person who solicits the donation?  For example, if Person A asks Person B to donate money to Person A's child's school without disclosing that Person A's child attends that school, does that constitute criminal wire fraud?  Almost certainly not under controlling Supreme Court precedent, but that is the Government's new theory.  To the extent the Court intends to permit the Government to try Mr. Cohen based on this

Even now, the Government's theory is hopelessly vague, supplying no notice as to the theories or evidence to be pressed at trial. Is the Government now pursuing an omission theory, a misrepresentation theory, or a misappropriation theory? On the one hand, the Government now suggests that Messrs. Parsons and Lee may have knowingly made the donations to Beast Basketball, but that Mr. Cohen failed to disclose where the money was going, which suggests an *omissions* theory (in contrast to the misappropriation theory contained in the Indictment). Gov't Mot. at 7 n.4. On the other hand, the Government suggests that Mr. Cohen represented to Mr. Parsons (but not Mr. Lee) that the money "[h]elped a lot of future [basketball] prospects and a lot of underprivileged kids," but, as the Government intends to argue, "the Children were neither 'future prospects' nor 'underprivileged kids.'"[4]  *Id.* at 8. This theory suggests a potential *misrepresentation* theory. If so, does the Government intend to litigate whether the Beast Basketball players were actually "future prospects" or "underprivileged" to prove the falsity of this representation? The defense can only guess. It is precisely for this reason, among others, that the constructive amendment doctrine exists, *i.e.*, to "prohibit[] the government from changing its approach midstream to rely on theories or evidence of which the indictment contained insufficient notice." *Sakoc*, 115 F. Supp. 3d at 483 (citation omitted).

To safeguard Mr. Cohen's rights under the Fifth Amendment's Grand Jury Clause, the defense respectfully requests that the Court preclude the Government from offering evidence or argument as to its new theories which are not only excluded from the Indictment but are also

---

novel theory, the defense requests a briefing schedule to litigate whether the new theory states a claim under the wire fraud statute.

[4] Again, Mr. Parsons could not have been aware of the representations in this October 2020 text message while he was making the donations because his last Beast Basketball donation occurred in September 2019.

fundamentally inconsistent with it.[5]  Specifically, as to Beast Basketball, the Government should be limiting in pursuing the theory that alleged in the Indictment:  that Messrs. Parsons and Lee did not authorize any of the transactions at all.  They should not be permitted to state or imply to the jury that there is anything impermissible about any of the Beast expenditures or that Mr. Cohen could be convicted of wire fraud if Messrs. Parsons or Lee were not aware of any particular Beast expenditure.

## II.    The Court Should Deny the Government's Request to Admit Mostly Unidentified "Various Statements" the Government Argues Are Not Subject to the "Hearsay Rule" [Resp. to Gov't Mot. § I]

In Section I of its brief, the Government asks for permission to introduce at trial a range of largely unidentified statements from various individuals as either non-hearsay or subject to a hearsay exception.  Each of these statements either should be excluded now or would require significant more specificity before their admissibility can be ruled upon.  The first category of statements—various complaints made by a "Baseball Player," Nyjer Morgan, to be introduced purportedly for their effect on the listener—should be excluded because the Government did not and cannot show that these complaints actually reached Mr. Cohen.  The Government also states

---

[5] The Government's motion in limine suggests another unconstitutional broadening of the indictment besides this Beast Basketball issue.  In particular, the Government's motion identifies an entirely new "victim," Lauren Holiday, stating that "the victims of the defendant's fraud scheme included Athlete-1, a professional basketball player *and his wife (the 'Spouse')*."  Gov't Mot. at 51 (emphasis added).  The allegation that Ms. Holiday is a victim is completely absent from the Indictment, which alleges only three victims.  *See* Indictment at ¶ 2 (alleging that Mr. Cohen "orchestrated a scheme to defraud three different professional basketball player clients [(Mr. Holiday), (Mr. Parsons), and (Mr. Lee), respectively]").  The Government should be precluded from referring to Ms. Holiday as a victim at trial or arguing that Mr. Cohen committed wire fraud if Ms. Holiday was not informed of material facts.  *See Mucciante*, 21 F.3d at 1236 (implying that where a "new victim" or "new theory" is added to the Indictment at trial, it is "unconstitutionally broadened") (citation omitted); *United States v. Ward*, 747 F.3d 1184, 1191–92 (9th Cir. 2014) (finding a constructive amendment where the defendant was indicted for aggravated identity theft as to two named victims, but both the trial evidence and the prosecutor's arguments during opening and closing referred to other victims who were unnamed in the indictment); *cf. United States v. Basciano*, 384 F. App'x 28, 33 (2d Cir. 2010) (no constructive amendment where indictment and proof at trial concerned the same alleged victim).

that it intends to introduce various statements made by alleged coconspirator Brian Gilder, Mr. Cohen's former Morgan Stanley colleagues Connie Webb and Stephanie Peralta, and Mr. Cohen's attorneys in other proceedings.  But the Government's motion largely regurgitates the applicable legal standards without ever identifying the specific statements it wants to introduce.  As a consequence, the Court cannot possibly assess whether these materials are admissible under the various fact-based inquiries that control the relevant analyses.  Most of the Government's requests should be denied on that basis.  Should the Government ever identify the statements it actually seeks to introduce, Mr. Cohen reserves the right to object that they do not comply with the applicable Rules of Evidence (as he anticipates).

## A.   The "Baseball Player's" (Nyjer Morgan) Complaints Should Be Excluded as Irrelevant Hearsay Because There is No Evidence That They Had Any Effect on the Listener [Resp. to Gov't Mot. § I.B.1]

The Government seeks to introduce complaints that Mr. Morgan made to employees of Morgan Stanley about Mr. Cohen's efforts as his financial advisor.  These complaints do not pertain to any issues in the Indictment but rather demonstrate simply that Mr. Morgan was "angry about [Mr. Cohen's] management of his finances, including [his] recommendation of certain loans that [Mr. Morgan] made, which culminated in his filing of a FINRA arbitration against Morgan Stanley on or about May 26, 2020." Gov't Mot. at 16.  The Government, however, for some reason does not intend to call Mr. Morgan to testify about these supposed "complaints," which are paradigmatic hearsay and propensity evidence.  In arguing to the contrary, the Government contends that it aims to introduce this evidence not to show the truth of the complaints, but to show the alleged effect that those complaints had on Mr. Cohen's state of mind or motive.  But the Government's argument is fatally mistaken.

18

The Government's purported non-hearsay basis for Mr. Morgan's complaints—that they had an effect "on the listener (the defendant) and the defendant's resulting state of mind," Gov't Mot. at 17—fails for a simple reason: the Government has failed to show that any of these statements actually reached Mr. Cohen. It is black-letter law—and a basic matter of logic—that a statement cannot have an effect on a listener if the listener never actually heard the statement. *See United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) ("A statement is offered to show an effect on the listener only if the listener heard and reacted to the statement, and if the 'actual use' of the statement at trial was to demonstrate the listener's response.") (citation omitted); *United States v. Pena*, No. 23-CR-00748, 2025 WL 52718, at *3 (D.N.M. Jan. 9, 2025) (same); *United States v. Andrade*, No. 20-CR-249, 2025 WL 670456, at *2 (N.D. Cal. Mar. 3, 2025) (same). Thus, any statement that Mr. Morgan made to Mr. Cohen's "staff[] and other Morgan Stanley personnel," Gov't Mot. at 17, that did not reach Mr. Cohen, is inadmissible because the statement could not have an effect on Mr. Cohen's state of mind or motive. Thus, for the Government to have made a successful showing that it should be allowed to introduce Mr. Morgan's "complaints," it was required to proffer some evidence that Mr. Cohen ever heard such statements. It did not, and thus its motion on this ground should be denied.[6]

## B. Statements of Mr. Cohen's Supposed Co-Conspirators Should Not be Admitted At This Point [Resp. to Gov't Mot. § I.B.2]

The Government next seeks to offer unidentified statements made by Brian Gilder and, potentially, Ramel and Taba Lloyd (the operators of Beast Basketball), under the hearsay exception for statements made by purported coconspirators. But the government has not identified specific

---

[6] In any event—for the reasons laid out further below in responding to the Government's separate argument that Mr. Morgan's May 26, 2020 FINRA complaint should be admitted—any conceivable relevant statement of Mr. Morgan's concerns that Mr. Cohen heard would only be relevant if they were heard by Mr. Cohen *prior* to him making the allegedly fraudulent transactions at issue.

statements from Mr. Gilder or the Lloyds that it aims to introduce, writing only that "[t]he Government may seek to offer statements of [Mr. Cohen's] coconspirator." Gov't Mot. at 18. The Court should of course not grant the Government blank check permission to introduce any statement it wants from Mr. Gilder or the Lloyds, and Mr. Cohen reserves the right to object to the admission of any particular statements should it do so. *See United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) ("[T]hese hearsay statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy.") (citation omitted). That said, the Court should at this point deny the Government's request to introduce any statements from the Lloyds as co-conspirator statements. The Government has simply failed to proffer anything beyond pure conjecture that the Lloyds were in any way co-conspirators as to the charges alleged in the Indictment.

## C. Statements of Mr. Cohen's Supposed Subordinates Should Not be Admitted At This Point [Resp. to Gov't Mot. § I.B.3]

The Government states that it intends to offer unidentified statements made by Mr. Cohen's former Morgan Staney colleagues, Connie Webb and Stephanie Peralta, under Rule 801(d)(2)(D), which permits a statement to be offered against an opposing party where the court finds "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condominium Ass'n.*, 963 F.2d 534, 537 (2d Cir. 1992).

However, the Government has not established that such an agency relationship existed between Mr. Cohen and Ms. Webb and Ms. Peralta, who were not Mr. Cohen's employees or agents but Morgan Stanley's. To be sure, under this hearsay exception, "testimony should not be excluded simply because it is offered against a corporate employee rather than the company itself," but the

20

Government still needs to establish that factors proving an agency relationship. *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992). In criminal cases, such an agency relationship may arise where the agents "were answerable and directly responsible to" the defendant. *Rioux*, 97 F.3d at 660. But, here, the Government has failed to show that Ms. Peralta and Mr. Webb were "hand-picked by" Mr. Cohen or "served at his pleasure." *Id.* (considering these two factors among three to determine if an agency relationship existed). Instead, Ms. Peralta and Ms. Webb were Morgan Stanley employees and Client Service Associates who reported to other Morgan Stanley employees (in addition to Mr. Cohen), and the Government has not suggested that Mr. Cohen had hiring or firing authority over them. *Cf. Zaken*, 964 F.2d at 1323 (agency relationship existed where declarant was "nonetheless answerable to Boerer who, as the company's principal owner, directed its operations and ultimately made all the final decisions"). Because "it is not enough for the declarant merely to occupy a position lower down in a chain of command reporting to the defendant," *United States v. Goldstein*, No. 21-CR-550, 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023) (Chin, J.) (citing cases from other Courts of Appeals), the Government has failed to show an agency relationship. Indeed, the Government's cases are readily distinguishable because Ms. Webb and Ms. Peralta were not simply Mr. Cohen's assistants, *see Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemp. Dance, Inc.*, 380 F.3d 624, 644 (2d Cir. 2004), and the Government is seeking to offer their statements against another corporate employee, not against the entity that employed them, *see Attis v. Solow Realty Dev. Co.*, 522 F. Supp. 2d 623, 629 n.3 (S.D.N.Y. 2007) ("[D]efendants do not dispute that Bier was an agent of Solow Realty or that the aforementioned statements were made while she was so employed.").

Moreover, because the admissibility of each statement is fact- and statement-specific, turning on whether the statements were made during the course of, and relating to, the purported

agency relationship, the Government must establish that the Rule 801(d)(2)(D) test is met for each statement.  The Government's motion should be denied (and the defense reserves the right to challenge any such statements should the Government later seek to introduce them).

**D.  Statements of Mr. Cohen's Attorneys Should Not Be Admitted at This Point [Resp. to Gov't Mot. § I.B.4]**

The Government also seeks to introduce statements that Mr. Cohen's attorneys made in Mr. Cohen's divorce proceeding and/or FINRA enforcement proceedings under the same hearsay exception, Rule 801(d)(2)(D).  As with subordinate statements, however, attorney statements can be introduced only if they meet the agency standard identified above.  *See Pugh v. Casimir*, No. 18-CV-7350, 2021 WL 4463103, at *10 (E.D.N.Y. Sept. 29, 2021).  Further, "judicial admissions are limited to statements of fact, and do not include an attorney's legal theories, arguments, or conclusions." *In re Rsrv. Fund Sec. & Derivative Litig.*, No. 09-CV-4346, 2012 WL 12354233, at *8 (S.D.N.Y. Oct. 3, 2012) (citation omitted).  Despite there being specific preconditions to introducing attorney statements, the Government yet again fails to identify any specific attorney statements it wants to introduce through this rule.  So, again, neither the defense nor the Court can determine whether any of the statements the Government wants to introduce meet the applicable admissibility standards.  The Government's motion should thus be denied (and the defense reserves the right to challenge any such statements should the Government later seek to introduce them).













███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

███████████████████████████████████████████

████████████████████████████████████

### IV.    The Court Should Not Admit Evidence of Certain of Mr. Cohen's Alleged Prior Conduct Identified by the Government [Resp. to Gov't Mot. § III]

In Section III of its brief, the Government asks the Court to admit evidence of Mr. Cohen's prior acts, over a period that spans more than 15 years and concerns events that are wholly unrelated to the charges at trial. This evidence includes: (i) an alleged failure by Mr. Cohen to pay taxes on income from the viatical life-insurance policies, purportedly as either direct evidence or to show knowledge, motive, or intent; (ii) Mr. Morgan's FINRA complaint, filed on May 26, 2020, purportedly to show an effect on Mr. Cohen's mind, even though the complaint was filed after the relevant events at issue here; (iii) Mr. Cohen's alleged violations of Morgan Stanley and FINRA policies, purportedly to show criminal intent, knowledge, or willfulness; (iv) an email from Morgan Stanely from September 21, 2020 stating that Mr. Cohen was under investigation and placed on administrative leave, purportedly to explain why certain payments to Mr. Cohen did in fact end; ████████████████████████████████████████████████

███████████████████████████████████████████████

(vii) testimony from Lauren Holiday, Jrue Holiday's wife and a new "victim" who was not identified in the Indictment, about her—and *even her mother's*—vague "concerns" about the

service they received from Morgan Stanley; and (viii) FINRA complaints filed by two former NFL players in 2009 and 2010 concerning more wholly unrelated transactions for a litany of undertheorized Rule 404(b) purposes. Such a blatant avalanche of propensity evidence should be precluded on hearsay and relevance grounds and under Rules 404(b) and 403.

## A. The Court Should Not Admit Evidence of Mr. Cohen's Federal Tax Returns [Resp. to Gov't Mot. § III.B.1]

The Government seeks to introduce alleged evidence that Mr. Cohen did not report income he received from the viatical transactions on his federal tax returns as either direct evidence or under Rule 404(b). The Court should exclude this evidence as irrelevant, insufficiently similar to the charged transactions under Rule 404(b), and prejudicial and confusing under Rule 403.

Any alleged failure to pay taxes is not relevant direct evidence of a crime. As one district court in this Circuit explained in summarizing the relevant caselaw, such tax evidence "is hardly the kind of inextricably linked evidence that the Second Circuit has found is appropriately admitted as direct evidence" in fraud cases. *United States v. Kurland*, No. 20-CR-306, 2022 WL 2669897, at *7 (E.D.N.Y. July 11, 2022), *aff'd*, No. 23-6755-CR, 2024 WL 5165547 (2d Cir. Dec. 19, 2024) (collecting cases).

Nor is the tax evidence admissible under Rule 404(b). To be sure, as the Government notes, certain district courts have exercised their discretion to admit such evidence, and the Second Circuit has on occasion affirmed those decisions on abuse-of-discretion review. Gov't Mot. at 35–36. But, here, the Court should exclude such evidence. Under Rule 404(b), "the probative value of the proffered evidence depends largely on whether or not there is a close parallel between the crime charged and the acts shown." *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (citation omitted). Simply put, this is a fraud case, not a tax case: "The Government could have

charged those crimes but did not." *Kurland*, 2022 WL 2669897, at *6. And the Government has not carried its burden of "identify[ing] similarities between the charged and uncharged transactions." *United States v. Stein*, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007) (excluding other acts evidence under Rule 404(b).

Even if the Government could surmount Rule 404(b), however, it nonetheless fails Rule 403's balancing test. While courts have sometimes admitted evidence of tax returns in fraud cases, the evidence here is muddled, which risks "lead[ing] to a confusing 'mini-trial' relating to the [alleged] fraud that would have some probative value, but a significant risk of unfairly prejudicing Defendants by introducing evidence indicating a propensity to commit fraud, confusing the issues actually alleged in the Indictment, and misleading a jury." *United States v. Levy*, No. 11-CR-62, 2013 WL 655251, at *1 (S.D.N.Y. Feb. 22, 2013). Evidence of alleged failure to pay taxes "could lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Zhong*, 26 F.4th 536, 553 (2d Cir. 2022) (internal citation omitted). As the Second Circuit explained where prior-acts tax evidence was admitted, the risk is that the jury would believe that if the defendant were willing to lie to the IRS, he might be "willing . . . to lie to others" or that interpret the tax evidence as "as an indication of [the defendant's] general mendacity." *United States v. Shellef*, 507 F.3d 82, 101 (2d Cir. 2007), *abrogated on other grounds by Kousisis v. United States*, 605 U.S. 114 (2025).

## B. The Court Should Not Admit Evidence of "Claims of Fraud by the Baseball Player" [Resp. to Gov't Mot. § III.B.2]

The Government seeks to introduce evidence of a FINRA arbitral claim that Mr. Morgan filed against Morgan Stanley on May 26, 2020. In the Government's view, this arbitral claim is relevant because it goes to Mr. Cohen's state of mind in that it supposedly "establish[es] the

defendant's motive to steal from Athlete-2 to pay off [Mr. Morgan]." Gov't Mot. at 37.  Notably, the Government aims to do so without even calling Mr. Morgan as a witness (he is conspicuously absent from the Government's witness list).  Allowing this evidence to come in at trial would countenance the introduction of propensity evidence that is hearsay and plainly irrelevant to any issue at trial (as even a cursory review of the factual timeline reveals).

To start, contrary to the Government's suggestion, Mr. Morgan's FINRA claim is wholly irrelevant to Mr. Cohen's state of mind or motive, as the undisputed factual timeline makes clear. Construed most generally, the Government's theory here is that Mr. Cohen's awareness of Mr. Morgan's FINRA complaint is what spurred Mr. Cohen to steal from Mr. Parsons to pay off Mr. Morgan.  But that theory is totally inconsistent with the facts.  As the Government acknowledges, Mr. Cohen instructed Mr. Gilder to transfer $93,125 from the Gold Sports Account to Mr. Morgan's account pursuant to transactions that took place "[b]etween November 27, 2019 and May 8, 2020." But Mr. Morgan's FINRA complaint was filed nearly *six months after* the date of the first allegedly fraudulent transaction and weeks even after the *last* transaction.  The FINRA complaint thus simply cannot logically be relevant to Mr. Cohen's state of mind or motive for those allegedly fraudulent transactions that occurred *well before it was filed*.  The argument thus defies both logic and established law, which holds that "allegations concerning after-the-fact events are immaterial to . . . state of mind."[12]  *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 514 (S.D.N.Y. 2005); *see also In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, No. 14-CV-4471, 2016 WL 922711, at *8 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs' allegations about subsequent actions

---

[12] That is not to suggest that subsequent statements are never relevant to state of mind.  For instance, a ***defendant's*** subsequent statements made in close proximity to relevant transactions might be "relevant to the defendants' state of mind at the time those payments were made."  *United States v. Gatto*, 986 F.3d 104, 139 n.2 (2d Cir. 2021) (Lynch, J., concurring in part and dissenting in part).  But the statements the Government is seeking to admit here are *Mr. Morgan's*, not Mr. Cohen's, and therefore provide no insight into *Mr. Cohen's* motive or state of mind during the relevant time.

say nothing about the Defendants' state of mind at the time of the alleged misstatements."); *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986) ("Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not relevant.") Simply put, Mr. Morgan's FINRA complaint provides no insight into Mr. Cohen's motive or state of mind before it was filed.

To be sure, Mr. Morgan's FINRA complaint would *conceivably* be relevant if Mr. Morgan had told Mr. Cohen in advance about the forthcoming FINRA arbitration *before* the transactions at issue. Tellingly, the Government acknowledges that it knows it is the defense's position that Mr. Morgan did *not* do so. Gov't Mot. at 37 n.14. Indeed, the Government confusingly argues that this defense theory "makes it particularly important that the Government be able to show that [Mr. Morgan's] complaints were serious enough that they led to actual litigation." *Id.* But that does not make sense. Rather, it shows with absolute clarity that the Government has *no* evidence that Mr. Morgan said anything to Mr. Cohen about the forthcoming FINRA filing before it was filed. (If the Government had that evidence, it would have said so in its motion, rather than saying it needs the FINRA complaint to somehow prove it.). The mere fact that a Morgan Stanley employee messaged Mr. Cohen that Mr. Morgan was "pissed," Gov't Mot. at 9, nearly two years prior to the filing of the complaint can also not show that the May 2020 complaint had an effect on Mr. Cohen before it was filed. More importantly, however, if the Government believes that Mr. Morgan told Mr. Cohen about the FINRA complaint *before* the transactions at issue, *it could call Mr. Morgan as a witness to testify as such*. Accordingly, the Court should exclude Mr. Morgan's complaint.

**C.  The Court Should Not Admit Evidence of Mr. Cohen's Supposed Violations of Morgan Stanley and FINRA Policies [Resp. to Gov't Mot. § III.B.3]**

The Government next seeks to introduce various Morgan Stanley and FINRA policies pertaining to, among other things, conflict of interests, disclosure and regulation of investments, and professional trainings and certifications.  Gov't Mot. at 38–42.  Mr. Cohen's alleged violation of these policies, the Government contends, are either direct evidence or relevant "other acts" to show knowledge, motive, and intent.  The Government is wrong.  These policies are irrelevant and should be excluded under Rule 403.

Simply put, these policies are irrelevant to the issue at trial: whether Mr. Cohen engaged in a scheme to defraud his clients.  Whether Mr. Cohen complied with these types of internal company rules does not, of course, make it more it "more or less probable" that he committed a crime, the "fact . . . of consequence" in this trial.  Fed. R. Evid. 401(a)–(b); *see United States v. McCright*, 821 F.2d 226, 229 (5th Cir. 1987) ("[The defendant's] many violations of the bank's internal operating procedures do not alone create offenses prosecutable in federal court" (citing *United States v. Clark*, 765 F.2d 297, 303 (2d Cir.1985)); *cf. United States v. Finnerty*, 533 F.3d 143, 151 (2d Cir. 2008) ("But violation of an NYSE rule does not establish securities fraud in the civil context, let alone in a criminal prosecution." (citation omitted)).  In any event, the broad array of policies the Government cites in Morgan Stanley's "Doing the Right Thing" section "clearly contains irrelevant internal procedures and would be unnecessarily overwhelming to the jury"; "whether [Mr. Cohen] violated a tangential rule . . . would unfairly prejudice the jury."  *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 200 (S.D.N.Y. 2008).  And, even if the rules were relevant, the distinct standards governing bank and industry policies risks confusing the jury and prejudicing Mr. Cohen: the Government's "case against [Mr. Cohen] [should] have to stand

on its own hind legs unaided by any prejudicial reference to violations of [civil regulatory bank statutes]." *United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980).

To be sure, as the Government notes, certain district courts have exercised their discretion to permit policies such as these to be introduced as evidence of intent in fraud cases, and the Second Circuit has at times held that it was not an abuse of discretion for the district courts to have done so. *See* Gov't Mot. at 44–45. But just because district courts possess the discretion to make such evidentiary decisions does not mean the Court should here. The concern about confusing the jury and prejudicing Mr. Cohen is even more acute because of Morgan Stanley's recognizable name, which lends legitimacy to the rules and may suggest criminal guilt to the jury by mere virtue of alleged violations of internal policies.

Regardless, because the language of certain policies resembles that of the criminal statutes, there is an even higher risk of juror confusion, of watering down the applicable criminal elements, and introduction of these rules would further be cumulative. For example, FINRA Rule 2020 states that registered professionals shall not "effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance," Gov't Mot. at 41, which shares key terms with the criminal charges here but risks watering down, for the jury's mind, the applicable standard in a criminal fraud case. Indeed, whether Mr. Cohen did, in fact, engage in fraudulent conduct is precisely the issue for trial, so introduction of, and testimony about, this rule, might confuse the jury in this *criminal* fraud case. On these facts, "evidence and arguments concerning [the defendant's] possible violations of civil banking regulation [will] impermissibly taint[] the trial." *United States v. Wolf*, 820 F.2d 1499, 1504–05 (9th Cir. 1987) (finding that such evidence and argument "created a serious risk that the jury would

find [the defendant] guilty of criminal misapplication and false entry because he failed to comply with [a Federal Reserve Board regulation]").

In any event, for many of these policies, the Government cannot lay a foundation that these policies are applicable to the facts of this case. For example, Sections 2.2.1 and 2.2.2 of Morgan Stanley's Wealth Management U.S. Compliance Manual govern an "an economic . . . interest that differs from (or that appears to differ from) the interests of the Firm" or its clients. This policy is too vague and invites prejudicial speculation about what such an economic interest could be. Similarly, Section 2.3 concerns, in part, a Morgan Stanley employee "direct[ing] the financial activities of or render[ing] investment advice to any . . . charitable . . . organization." This policy is irrelevant, and horribly misleading to even imply that it is. Indeed, it is worded in such a way that could make it sound like Mr. Cohen has violated it. There is no evidence whatsoever that Mr. Cohen "direct[ed] the financial activities of or render[ed] investment advice to any . . . charitable . . . organization[]" or that he received any compensation with respect to such a role. The Government is banking on it sounding relevant and nefarious because this case also involves a charitable organization.

Finally, even if the Court accepts the argument that Mr. Cohen's knowledge of the Morgan Stanley and FINRA policies is relevant (respectfully, it should not), it should at least preclude the Government from making any argument that Mr. Cohen violated such policies (or that anyone determined that he did), which would mitigate against the possibility that the jury convict Mr. Cohen based on any alleged violation of non-criminal policies. In *United States v. Glover*, No. 24-CR-370, 2025 WL 1580848 (S.D.N.Y. June 3, 2025) (Broderick, J.), this Court accepted the Government's representation that it did "not intend to argue that [the defendant] violated . . . the [company's] policies outlined in the Policies document," at *13.

42

**D. The Court Should Not Admit Evidence of a Purported "Investigation" by Morgan Stanley [Resp. to Gov't Mot. § III.B.4]**

The Government next seeks to introduce evidence that, on September 21, 2020, Morgan Stanley sent Mr. Cohen an email informing him that he was under investigation and being placed on paid administrative leave, which, the Government speculates, is a "plausible reason why the defendant and Gilder stopped taking money out of the JBM Client Trust Account on September 3, 2020." Gov't Mot. at 47. As the Government puts it, Mr. Cohen "learned just 18 days later that he was under investigation for misconduct by Morgan Stanley, which would provide a motive for him to stop taking money from the JBM Client Trust Account from that date forward, to further conceal his fraud scheme from Morgan Stanley." *Id.* Not only is this theory pure speculation, the probative value of this investigation would be outweighed by the risks of jury confusion and prejudice against which Rule 403 safeguards. *See Levy*, 2013 WL 655251, at *1. This prejudice is especially confounded here because we believe the investigation at issue related to at least certain of the conduct alleged in the Indictment.



███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

**G. The Court Should Not Admit Evidence of the "Concerns" That Jrue Holiday's Wife and Her Mother Supposedly Had About Mr. Cohen [Resp. to Gov't Mot. § III.B.7]**

In perhaps the Government's most indefensible move, it asks the Court for permission to introduce a series of irrelevant customer complaints that Jrue Holiday's wife, Lauren Holiday, supposedly had about Mr. Cohen's service as a financial adviser. In what reads like a Yelp review of Mr. Cohen's services over a span of several years, Ms. Holiday apparently intends to testify that

(i)    in 2016 and 2017, she had concerns that her ability to authorize financial transactions at her Morgan Stanley account had at one point been removed; (ii) in "approximately 2018," *her mother* allegedly was charged unexpected fees from Morgan Stanley, and (iii) an independent audit that the Holidays' requested "took weeks or months" and revealed that they were paying more in fees to Morgan Stanley than they understood and they then left Morgan Stanley.  This evidence, the Government urges, tends "to show that the defendant sought to conceal information from Athlete-1 and the Spouse, which goes to his criminal intent."  Gov't Mot. At 52.  That explanation makes no sense and this evidence is blatantly inadmissible.

To be clear, it is hard to even hypothecate a potential relevance to this proffered testimony, *i.e.*, that Ms. Holiday at one point had concerns that her ability to authorize transfers had been removed by someone or that her or her mother thought that Morgan Stanley was charging them too much in fees.  *United States v. Kurland*, No. 20-CR-306, 2022 WL 2669897, at *4–5 (E.D.N.Y. July 11, 2022) (rejecting Government's argument that unrelated transactions were "inextricably intertwined" where they "involve[d] different parties and different types of transactions"); *Konstantinovskiy*, 2024 WL 3360379, at *7 (same); *see also Gordon*, 987 F.2d at 908 (similar as to Rule 404(b)).  Indeed, the Government does not explain whether there was even anything improper at all about the supposed access removal or fees (let alone that they were valid concerns), only that Ms. Holiday and her mother had some "concerns" about them.  It simply cannot be that a bank customer's everyday concerns over account access and bank fees can be affirmative evidence in a wire fraud case. Moreover, the Government does not even suggest that Mr. Cohen had anything to do with either the access removal or charging of fees (and presumably the fees went to *Morgan Stanley*, and not Mr. Cohen), let alone whether his involvement involved

46

"conceal[ment]" of any kind.  Each of these issues are wholly unrelated to the allegations in the Indictment and are plainly designed just to pile on evidence to make Mr. Cohen look like a bad guy.  *See Konstantinovskiy*, 2024 WL 3360379, at *7 (noting that where the Government seeks to introduce evidence of "wholly separate" acts, the inference is that the Government intends only "to suggest the Defendants' bad character"); *see also United States v. Donovan*, 577 F. Supp.3d 107,115 (E.D.N.Y. 2021) ("such evidence is likely to confuse the jury about why the Government is attempting to prove additional interspersed transactions when the jury has been asked to determine Defendant's guilt as to a specific [one]").  This is precisely what evidentiary rules against propensity are meant to avoid.

Nor is there any merit to the suggestion that these "concerns" of Ms. Holiday and her mother are in anyway "necessary to complete the story of the crime on trial."  Gov't Mot. At 52.  The Government hinges this argument on *United States v. Carboni* 204 F.3d 39, 44 (2d Cir. 2000) and its progeny, but "courts in this District have interpreted [such] cases narrowly," *United States v. Martoma*, 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014).  "Indeed, the Indictment itself refutes the Government's 'inextricably intertwined' claims, as it tells a compelling, complete, and detailed story," *id.* (quoting *United States v. Hatfield*, 685 F.Supp.2d 320, 323 (E.D.N.Y. 2010), without any mention of these transactions—or Ms. Holiday, for that matter (and especially not her mother).  Because the Government has utterly failed to argue, let alone demonstrate, that these "concerns" from the Holidays are "crucial information without which the jury will be confused or the government's theory of the case unfairly curtailed," *United States v. Stein*, 521 F. Supp. 2d 266, 271 n.16 (S.D.N.Y. 2007) (quoting *United States v. Townsend*, No. 06-CR-34, 2007 WL 1288597, at *2 (S.D.N.Y. May 1, 2007)), as it must, these testimony about these transactions should be excluded.  Nor has the Government shown that these entirely unrelated transactions are

"sufficiently similar to the conduct at issue" for inclusion under Rule 404(b).  *See Gordon*, 987 F.2d at 908.  Even if these transactions were relevant under Rules 402 or 404(b) (and they are not), they should be excluded under Rule 403, as it is "likely to divert the jury's attention from the charged transactions."  *Stein*, 521 F. Supp. 2d at 271.

Finally, it bears noting the obvious inadmissibility of any testimony from Ms. Holiday that *her mother* supposedly had concerns about the fees charged on her account (and decisions that her mother made).  The evidence is textbook hearsay.  The Government is clear that they aim to present Ms. Holiday's mother's concerns for their truth: "Evidence that . . . her mother was charged unexpected fees . . . goes to [Mr. Cohen's] criminal intent."  Gov't Mot. At 52.  But the only "evidence" the Government previews about Ms. Holiday's mother being charged unexpected fees is the testimony of Ms. Holiday.  That Is paradigmatic hearsay.  And the Government does not even try to identify a non-hearsay reason for this evidence or an applicable hearsay exception.  It is painfully obvious that the rules of evidence do not allow the Government to call Ms. Holiday about statements her mother made that concerned bank fees she apparently believed she was being improperly charged.  It is equally true for similar reasons that Ms. Holiday cannot testify about an unidentified "audit" by an unidentified third party.[14]  *See id.* At 52.

### H.  The Court Should Not Admit Evidence of Decades' Old and Unsubstantiated "Prior Allegations of Fraud by Other Athlete Clients" [Resp. to Gov't Mot. § III.B.8]

The Government states that it intends to introduce "prior allegations of fraud" against Mr. Cohen by two former NFL players, Desean Jackson and Brandon Mebane, contained in FINRA complaints.  These complaints were filed in 2009 and 2010, respectively, when Mr. Cohen was

---

[14] Not only is evidence of this supposed "audit" inadmissible hearsay, the Government concedes it does not even *have* it, let alone has it produced it to the defense.  Should Ms. Holiday or any witness be permitted to testify about this supposed audit, the defense will need to subpoena the audit and retain an expert to cross-examine Ms. Holiday or any other witness on it.

employed by Wells Fargo (not Morgan Stanley).  The Government acknowledges it knows little else about these complaints but still somehow boldly contends that they are admissible under Rule 404(b) to show Mr. Cohen's fraudulent "intent, knowledge, plan, preparation, absence of mistake, and lack of accident."  Gov't Mot. At 53–54.  The Government should obviously not be allowed to introduce evidence of these decades' old and unsubstantiated allegations of which it has almost no information.

Remarkably, in fact, despite having investigated this case for over three years, the Government is admittedly "in the process of seeking additional information related to those allegations" and has only "limited information in the Government's possession about the precise details of the complaints made by Football Player-1 and Football Player-2," which leads it to conclude that the issue is not yet "ripe" for decision.  Gov't Mot. 53–54.  The Government's historical inattention to these matters also reveals their deep irrelevance to the offenses actually charged.  And, as for the Court itself, the Government's ignorance about these allegations undermines the purpose of motions *in limines*, which is to "to enable the trial court to streamline the trial of a case by ruling on specific evidence in advance of the trial."  *Dreni v. PrinterOn Am. Corp.*, No. 18-CV-12017, 2022 WL 2828153, at *1 (S.D.N.Y. July 20, 2022) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)).  It strains credulity that this evidence could be "relevant to show the defendant's intent, knowledge, plan, preparation, absence of mistake, and lack of accident" when the Government lacks "the precise details of the complaints."  Gov't Mot. At 53–54.

In any event, the Court can save the Government further trouble in investigating this matter by excluding this evidence on hearsay, relevance, and Rule 403 grounds.

The Government's tortured theory of relevance withers under minimal scrutiny. In a sentence that is both confused and confusing, the Government urges that "[e]vidence of these prior incidents and the defendant's knowledge of them may therefore be admissible pursuant to Rule 404(b) to show the defendant's fraudulent intent here, because such evidence would establish that the defendant was aware that he was not allowed to transfer funds between two of his clients without authorization." Gov't Mot. At 53. But the Government fails to articulate how administrative complaints involving unrelated transactions and distinct clients, when Mr. Cohen was employed by a different bank, and that were filed at least *seven years* before the period alleged in the Indictment, have any relevance to an issue at trial.

In any event, the Government has made no showing that these "prior incidents" actually happened. Administrative complaints with FINRA are simply that: unsubstantiated complaints. They do not establish Mr. Cohen's "intent to defraud," especially given that one appears to have been denied and the other settled (almost certainly with no admission of liability). *See* GX 2602. Indeed, where is "there is no evidence that the [] Transactions were fraudulent or illegal, . . . those other transactions cannot "logically show" [the defendant's] knowledge." *United States v. Kahale*, 789 F. Supp. 2d 359, 385 (E.D.N.Y. 2009) (quoting *United States v. Gordon*, 987 F.2d 902, 908–09 (2d Cir. 1993)). In any event, these complaints "involve different parties and different types of transactions" from those at issue at trial, *Konstantinovskiy*, 2024 WL 3360379, at *7 (quoting *Kurland*, 2022 WL 2669897, at *4–6), and were submitted nearly a decade before the conduct charged in this case, *see Gordon*, 987 F.2d at 908 (noting that it is "an abuse of discretion for the trial court to admit other-act evidence if the other act or acts are not sufficiently similar to the conduct at issue") (citations omitted). Simply put, "[e]vidence offered concerning an unrelated administrative proceeding is too attenuated to be probative of [the defendant's] knowledge and

intent in the instant case and risks unfair prejudice, confusion of the issues, and misleading the jury." *United States v. Nekritin*, No. 10-CR-491, 2011 WL 2462744, at *4 (E.D.N.Y. June 17, 2011).[15]

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Government's motions *in limine*.

---

[15] The Government should be precluded from preventing the defense from making broad arguments identified by the Government in Gov't Mot. § IV.  At this stage, the Government's request is premature as to any such arguments that the defense may raise at trial.

Respectfully submitted,

Michael L. Bloch

BLOCH & WHITE LLP
Michael L. Bloch
Benjamin D. White
Cristina Alvarez
90 Broad Street, Suite 703
New York, New York 10004
(212) 901-3820
mbloch@blochwhite.com

MANCINI SHENK LLP
Mark Sedlander
1925 Century Park East, Suite 1700
Los Angeles, California 90067
(424) 652-4016
msedlander@mancinishenk.com

*Counsel for Darryl Cohen*