UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.                                             No. 23-cr-134 (VSB)


DARRYL COHEN,

*Defendant.*

---

## DEFENDANT DARRYL COHEN'S REPLY IN
## FURTHER SUPPORT OF HIS MOTIONS *IN LIMINE*

MICHAEL L. BLOCH, ESQ.
BENJAMIN D. WHITE, ESQ.
CRISTINA ALVAREZ, ESQ.

BLOCH & WHITE LLP
90 Broad Street, Suite 703
New York, NY 10004
(212) 901-3820

MARK SEDLANDER, ESQ.

MANCINI SHENK LLP
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
(424) 652-4016

*Counsel for Darryl Cohen*

To:  JAY CLAYTON, ESQ.
     United States Attorney
     Southern District of New York
     26 Federal Plaza, 37th Floor
     New York, New York 10278
     *Attn: Brandon C. Thompson*
     *Kevin B. Mead*
     *William Kinder*
     *Assistant United States Attorneys*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

I.   The Court Should Preclude the Government From Offering Evidence or Argument Related to Beast Basketball Payments............................................................................................. 1

    A.   The Court Should Preclude the Government from Offering Evidence of the Post-SBA Payments. ............................................................................................................... 1

    B.   The Court Should Preclude the Government from Offering Evidence of the Pre-SBA Payments. ............................................................................................................... 5

II.  The Court Should Preclude the Lay Witness Testimony of Michael Lutterloh and Peter Melley. ............................................................................................................................ 10

    A.   The Court Should Preclude Much of Mr. Lutterloh's Proposed Testimony.................. 11

        i.   Mr. Lutterloh's Proposed Testimony is Largely Expert Testimony. ........................ 12

        ii. Mr. Lutterloh Should Be Precluded from Testifying about "Heavy" Levels of State Regulation in Secondary Markets, Which Is Irrelevant, Prejudicial, and Likely to Confuse Both the Issues and the Jury. .................................................................... 13

        iii. Mr. Lutterloh Should be Precluded from Testifying About the At-Issue Transactions, About Which He Lacks Personal Knowledge. ................................. 15

    B.   The Court Should Preclude Some of Mr. Miller's Proposed Testimony......................... 17

    C.   The Court Should Preclude Mr. Melley's Proposed Testimony..................................... 18

        i.   Mr. Melley's Testimony Is Inadmissible Expert Opinion. ....................................... 19

        ii. The Government Has Failed to Lay a Foundation of Relevance for Mr. Melley's Testimony About FINRA Rules. ............................................................................ 20

III. The Court Should Preclude Evidence Related to Mr. Cohen's  █████████ Texts. ...... 20

CONCLUSION.................................................................................................................. 21

i

## INTRODUCTION

The Government's opposition confirms that its strategy in this case is to distract the jury from the charges it indicted by instead conducting a wide-ranging post-mortem of Mr. Cohen's entire career. The Government seeks to admit irrelevant and prejudicial evidence that has no bearing on the facts of this case as alleged in the Indictment—and, indeed, constitutes an impermissible constructive amendment of that indictment. The Government's arguments in support of its efforts to introduce inflammatory and prejudicial evidence of conduct completely absent from the allegations in the Indictment—the non-party Beast Basketball payments—are unavailing. And its efforts to slip expert testimony in through lay witnesses should be recognized for what they are: an attempt to evade the requirements of Rules 701 and 702. The Court should grant Mr. Cohen's motions *in limine*.

## ARGUMENT

**I. The Court Should Preclude the Government From Offering Evidence or Argument Related to Beast Basketball Payments.**

Contrary to the Government's arguments, evidence of the personal use of Beast Basketball funds by Taba Lloyd and Ramel Lloyd Sr. should be precluded as irrelevant and unduly prejudicial. The Court should preclude the Government from offering all evidence of any of the Lloyds' payments of which Mr. Cohen had no knowledge, whether those payments were made before or after the Lloyds sought and obtained an SBA ("Small Business Administration") loan.

### A. The Court Should Preclude the Government from Offering Evidence of the Post-SBA Payments.

The Government  states that it will only seek to admit evidence of the Lloyds' Post-SBA Payments if "the defense opens the door to their introduction" by calling either of the Lloyds as witnesses or by "arguing that Beast Basketball was either a legitimate charity or a legitimate effort to develop or recruit National Basketball Association ("NBA") prospects, thus putting at issue the

legitimacy of Beast Basketball." Jan. 3, 2026 Government Opposition ("Gov't Opp.") at 2. The Government has it entirely backwards.

First, the Government's insistence that it is *Mr. Cohen* who is "opening the door" to the issue of Beast Basketball's legitimacy is preposterous. It is the Government that is opening the door by alleging that Beast Basketball was *not* a legitimate organization at the time the players donated to it. To be clear, the Government should not be able to argue in any capacity that Beast Basketball was a "fake" or illegitimate charity. That concept is nowhere mentioned in the Indictment and indeed would constitute a new and uncharged theory of criminality. But, in the event the Court does allow such argument, it cannot be the case that if the defense *rebuts* the Government's allegations of illegitimacy with evidence that Beast Basketball was indeed legitimate during the relevant time period, the Government is then allowed to raise collateral, deeply prejudicial, and utterly irrelevant payments that occurred many months after the charged conduct. The allegations related to the Post-SBA Payments constitute an entirely separate scheme "involv[ing] different parties and different types of transactions." *United States v. Kurland*, 2022 WL 2669897, at *5 (E.D.N.Y. July 11, 2022). Evidence of the Post-SBA Payments relates to an alleged scheme to defraud the United States Small Business Administration, whereas the actually-charged conduct involves Messrs. Cohen, Parsons, and Lee. Courts regularly exclude evidence of such "entirely separate scheme[s]." *Id.* at *6.

Notably, the Post-SBA Payments are not mentioned *anywhere* in the Indictment. This is not because the Government was not yet aware of them—indeed, the main FBI agent investigating the case corresponded with the SBA about the Lloyds' application in June 2022, well before the grand jury was convened. *See* Ex. A, 2022.06.30 SBA-FBI Emails. Despite its awareness, the Government chose not to include any reference to the loan or the Lloyds' use of the resulting funds

2

in the Indictment (or, presumably, to the grand jury). That is, "[t]he Government could have charged those crimes but did not." *Kurland*, 2022 WL 2669897, at *6. It cannot now seek to prejudice the jury "based on a complex of facts distinctly different from that which the grand jury set forth in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 419 (2d Cir. 2012) (citation omitted).

In any case, the Post-SBA Payments are completely irrelevant to the charged conduct under FRE 401. Importantly, there is *absolutely no evidence* (and the Government identifies none) that Mr. Cohen had any knowledge that the Lloyds (i) sought; (ii) obtained; or (iii) used the funds resulting from an SBA loan *four months after* Beast Basketball effectively ceased operations. How the Lloyds chose to use Beast Basketball monies is irrelevant to whether Messrs. Parsons or Lee had previously authorized Mr. Cohen to make their donations to Beast Basketball. The charged conduct ended in September 2019, when the last transfer was made from Mr. Parsons' account to the Beast Account. Even if the Government could conceivably make an issue of Beast Basketball's legitimacy during the period of Mr. Parsons' donations—and for the reasons described below, it cannot do so without constructively amending the Indictment—the legitimacy of the organization more than ten months *after* the alleged fraud was completed "is neither inextricably linked with nor necessary to complete the story of the charged crimes." *Kurland*, 2022 WL 2669897, at *5.

Similarly, any possible relevance of Beast Basketball expenditures to Mr. Cohen's alleged motive disappears after the funds donated by Messrs. Parsons and Lee were fully utilized, which occurred in March 2020 at the latest—*months* before the Lloyds applied for an SBA loan. Any alleged motive would have dissipated by the time of these subsequent expenditures of money obtained by third parties, from a different source, without Mr. Cohen's knowledge. These payments

are unrelated to Mr. Cohen, did not benefit him, and therefore cannot possibly bear on his motive or intent for the charged crimes.

Further, the Government's glib insistence that the "difference in time" between September 18, 2019 (the date of the last transfer from Mr. Parsons to the Beast Account) and July 2020 (when the Lloyds obtained and began spending SBA funds) is not "significant" is absurd. Gov't Opp. at 7. During that time, a global pandemic effectively brought the entire world—and certainly the world of youth travel basketball—to a halt. There is no reason to think that Mr. Cohen would have knowledge of the Lloyds' expenditures when, as far as he knew, Beast Basketball (i) had no more funds and (ii) like the rest of the world, had been put on pause.

Alternatively, these payments should be precluded under Rule 403. Any possible relevance they could have to the conduct charged is overwhelmingly outweighed by the dangers of unfair prejudice and confusing the issues. "[I]ntroducing an entirely uncharged scheme involving different legal issues would create substantial and unfair prejudice, and would risk the jury confusing the issues." *Kurland*, 2022 WL 2669897, at *6. As to prejudice, the Government is wrong to suggest that "misuse of COVID funds is no more salacious than the financial fraud crimes on trial." Gov't Opp. at 8. To the contrary, there is every reason to think that the jury would find the allegedly fraudulent procurement and use of taxpayer money during a global pandemic more sensational than the charged conduct. And introducing evidence of the Post-SBA Payments runs the risk of triggering mini-trials about conduct that is not probative of Mr. Cohen's culpability. Evidence that the Lloyds procured an SBA loan and allegedly misused the resulting funds constitutes an entirely separate uncharged scheme to defraud the United States. "[E]vidence of an entirely separate scheme of [wire] fraud…could lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Kurland*, 2022 WL 2669897, at *6 (citation

4

omitted). The Government should not be allowed to "introduce new criminal conduct that would simply serve to confuse the jury"—particularly where there is no evidence Mr. Cohen had any knowledge of such conduct. *Id.*

## B. The Court Should Preclude the Government from Offering Evidence of the Pre-SBA Payments.

The Government's arguments in support of admitting evidence of the Pre-SBA Payments of which Mr. Cohen had no knowledge are likewise meritless. These payments are irrelevant to the crimes charged in the Indictment. Further, they rely on the Government's last-minute, unconstitutional constructive amendment of the Indictment. In the Government's own words, "[t]he key issue as to Beast Basketball will be whether Chandler Parsons and Courtney Lee approved and authorized the transfers to Beast Basketball and whether Cohen deceived them as to the transfers; not whether Beast Basketball utilized some fraction of those funds for basketball." Nov. 30, 2025 Government Opposition to Adjournment Motion ("Gov't Opp. to Adj. Mot.") at 2. Yet the Government—after having been presented with evidence that its key complaining witness lied to it about his knowledge of the transactions charged in the Indictment—is grasping at straws to find any possible crime with which Mr. Cohen may have been tangentially associated. The Government's attempts to shoehorn in this irrelevant and extremely prejudicial evidence constitutes an unconstitutional constructive amendment of the Indictment and should not be permitted.

The Government argues that this evidence is "plainly admissible" because the funds were "substantially used to build a gym in the defendant's backyard and constitute key evidence of the fraud and the defendant's motive to commit the fraud." Gov't Opp. at 5. The use of the funds to build the gym, however, is the **only** mention of the expenditures that appears in the Indictment, but the Government does not stop there—instead, it contends that payments the Lloyds made,

completely unrelated to the gym, will "explain why the Lloyds were willing to allow the defendant to control the Beast Account and personally use funds in that account." *Id.* at 5. The Government wildly speculates that "given the defendant's level of control over the Beast Account"—*i.e,* that Mr. Cohen secured the donations for the nonprofit and facilitated check deliveries to the contractor who built the gym—"there is ample evidence to infer that he was aware of *all* the ways that the money he fraudulently transferred into the Beast Account was being used." *Id.* at 5 (emphasis added). This is entirely speculative. To be clear, there is *no* evidence that Mr. Cohen was aware of any of the Lloyds's supposedly illegitimate expenditures (the Government, again, points to none). And aside from the payments for the gym—which the Government argues constitutes motive evidence—*none* of the Lloyds' payments are admissible, because none are relevant to the crime charged in the Indictment.

As explained in detail in Mr. Cohen's Opposition to the Government's Motions in Limine, at bottom, the Government's arguments as to expenditures by Beast Basketball reflects its totally new theory of wire fraud (that, contrary to the Indictment, the players *may have known* about the transfers to Beast Basketball) and thus they rely on an unconstitutional constructive amendment of the Indictment. The crime alleged in the Indictment is that Mr. Cohen transferred donations from Messrs. Parsons and Lee without their knowledge or authorization—*i.e.*, a secret misappropriation theory. Specifically, the Indictment alleges that Mr. Cohen "fraudulently diverted from the accounts of Athletes-2 and -3 approximately $500,000 in purported donations to a non-profit organization, *without the knowledge of Athletes-2 and -3*, a large portion of which was used to build athletic training facilities in" Mr. Cohen's backyard. Ind. ¶ 2 (emphasis added); *see id.* ¶ 28 ("In truth and in fact, however, Athletes-2 and -3 never authorized **any** such transfers.") (emphasis added). Yet again, this was not just inartful drafting in the Indictment—*it was the*

*Government's theory of wire fraud*.  Specifically, the grand jury was told in no uncertain terms that "Both Parsons and Lee said ***they never knew they were donating to Beast Basketball***." Ex. B at 12:3-7 (emphasis added). This has been the Government's theory from the time it presented the case to the grand jury through at least November 30, 2025, when it maintained that the "key issue as to Beast Basketball will be whether Chandler Parsons and Courtney Lee approved and authorized the transfers to Beast Basketball and whether Cohen deceived them as to the transfers; not whether Beast Basketball utilized some fraction of those funds for basketball." Gov't Opp. to Adj. Mot. at 2.

Thus, pursuant to the theory of the crime under which the grand jury indicted Mr. Cohen in 2023—which was the only theory of which the defense had notice until January 3, 2026, *just weeks before trial*—the *use* of the funds that were allegedly misappropriated has no relevance under FRE 401, because the use of the funds *after* they were transferred has no tendency to make it more or less true that Messrs. Parsons or Lee authorized those transfers. Only under the Government's new, constructively-amended theory—the theory that *even if* Messrs. Parsons and Lee had authorized their donations, Mr. Cohen "still committed fraud because he failed to disclose that the money was going to build a gym in his own backyard and that it was going to fund the basketball aspirations of the defendant's Children," Government Motions in Limine ("Gov't Mot.") at 7 n.4—would *any* expenditures by Beast Basketball meet FRE 401's relevance requirement.

The Government's constructive amendment is not only a violation of Mr. Cohen's Fifth Amendment rights, it is deeply prejudicial. Had the defense been on notice that the Government was pursuing an undisclosed use or affirmative misrepresentation theory, *see* Def. Opp. at 7-8, it would have pursued altogether different investigative and litigation strategies. For three years, the

defense has focused its efforts on defending against the theory approved by the grand jury—i.e., that Messrs. Parsons and Lee did not know about or authorize their donations to Beast Basketball. This last-minute snowballing of possible theories of liabilities is extremely prejudicial. Perhaps most importantly, if the defense had known of the Government's new theory, the defense would have sought expert testimony on what constitutes legitimate use of youth basketball non-profit funds. For example, to what degree is a non-profit director's use of her personal vehicle to further the non-profit's purposes eligible for reimbursement? Is it improper to solicit donations for a non-profit from which the solicitor's children benefit? The Government certainly cannot insinuate to the jury that there is anything improper about those expenditures when that was not mentioned as a basis of supposed criminality in the Indictment.

It bears noting that the Government's undisclosed use and/or affirmative misrepresentation theories are far from clear even now. The Government asserts that even if (directly contrary to the Indictment) Messrs. Parsons and Lee knew about the donations, Mr. Cohen "still committed fraud" because he (1) failed to disclose that the money would be used to build a gym in his backyard; (2) failed to disclose that the donations would "fund the basketball aspirations of the defendant's Children"; and/or (3) told Mr. Parsons, more than a year after Mr. Parsons' last donation, that the donations helped "future [basketball] prospects" and "underprivileged kids." Gov't Mot. at 7 n.4, 8. The Government conflates several issues in its last-minute, slapdash theory of liability: is the problem Mr. Cohen's children received an incidental benefit from the non-profit? If so, that theory appears nowhere in the Indictment, and, even if Mr. Cohen held a fiduciary duty, a transaction does not constitute a breach of fiduciary duty "simply because it incidentally benefits" the fiduciary. *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). Does the Government contend Mr. Cohen had a continuing duty to uncover and disclose to donors each expenditure by a non-profit run by

third parties? For that matter, what qualifies as "underprivileged"? How and when is a youth basketball player's status as a future prospect determined? How many future prospects were required to have trained with Beast Basketball in the few months the gym was in use before COVID-19 shut down the non-profit's operations? If the Lloyds' payments are relevant under the Government's new theory/theories of liability, where, in its view, are the bounds of this case? Is evidence that Mr. Cohen's fiancée once used the gym—which the Government produced to the defense for the first time on December 23, 2025—evidence of wire fraud? This lack of clarity only exacerbates the prejudicial nature of the Government's constructive amendment.

Next, the Government's argument that the Lloyds' purportedly illegitimate payments are somehow relevant to Mr. Cohen's motive also fails.  Again, contrary to the Government's speculative assertion, there is no evidence from which Mr. Cohen's knowledge of the Lloyds' payments can be inferred. It is hard to fathom how payments (i) made by third parties (ii) after the charged fraud was completed, and (iii) of which Mr. Cohen was not even aware, could possibly bear on Mr. Cohen's alleged motive to steal from two of his friends and most valuable clients.

Even if the Lloyds' supposedly illegitimate payments had some probative value—they do not—such minimal and attenuated probative value would be dwarfed by the prejudicial effect of the evidence, and therefore should be precluded under FRE 403. Evidence of these payments would effectively create several mini-trials about the extent to which the Lloyds misused the funds of the non-profit that they ran, which would "risk the jury confusing the issues," *Kurland*, 2022 WL 2669897, at *6, and "likely [] divert the jury's attention from the charged transactions." *United States v. Stein*, 521 F. Supp.2d 266, 271 (S.D.N.Y. 2007). The Government should not be permitted to comb through the Lloyds' Beast Basketball expenditures and distract the jury from the issue raised by the Indictment: whether Messrs. Parsons and Lee actually authorized their donations.

9

## II. The Court Should Preclude the Lay Witness Testimony of Michael Lutterloh and Peter Melley.

In its motions *in limine*, the defense moved to preclude the testimony of two Government witnesses: "a percipient witness from Montage Financial Group [Michael Lutterloh] about life insurance policies and viatical life settlements, including testimony about how such life insurance products operate, are regulated, and are transacted," Nov. 25, 2025, Gov't Disclosure of Non-Expert Witnesses Letter, and Peter Melley, an attorney at the Financial Industry Regulatory Authority ("FINRA"). In response to the defense's motions *in limine*, the Government has further identified the witness' proposed topics of testimony and has partially disclaimed that the witnesses will testify about topics that reeked of expert testimony. Nonetheless, much of the proposed testimony is still solely the subject of expert testimony and should be excluded on that ground alone. Moreover, testimony about several of the proposed topics—such as Mr. Lutterloh's testimony about regulations in irrelevant markets and Mr. Melley's testimony about FINRA rules—wholly lacks relevance to any issue at trial and is further prejudicial and likely to confuse the jury under Rule 403. Moreover, former Montage employee Derek Miller should be precluded from answering hypothetical "what would you have known" questions, which are both entirely irrelevant and prejudicial. Finally, the Government proposes that Mr. Lutterloh testify about transactions in which he played no role whatsoever; such testimony should also independently be excluded under Rule 602. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Should the Court permit any testimony from either witness (respectfully, it should not), it should strictly limit their testimony to the Government's enumerated topics.

### A. *The Court Should Preclude Much of Mr. Lutterloh's Proposed Testimony.*

The Government states that Mr. Lutterloh will "explain Montage's basic business, including the concept of viatical life settlements generally, and to testify about some of the specific transactions at issue," Gov't Opp. at 12, and proffers eight general topics of testimony:

> a. Explanation of what a viatical life settlement is;
> b. Explanation that the viatical life settlement market is heavily regulated on a state-by-state level;
> c. Explanation of the role of a provider like Montage, given that heavy level of regulation, and given the requirement in most states that the provider be licensed;
> d. Authentication of Montage documents relevant to the charged fraud;
> e. Explanation of the relevant contracts involving Montage, such as the Life Settlement Purchase Agreements and Escrow Agreements;
> f. Explanation of how transfers of funds that involved Montage corresponded with amounts due;
> g. Explanation that Montage never received copies of the contracts directly between JBM and the Athletes; and
> h. Explanation that Montage was unaware of (i) the contracts directly between JBM and the Athletes, or (ii) the large payments from the Athletes to JBM.

*Id.* at 16.

Mr. Lutterloh's testimony about the viatical life settlement market and its regulations should be excluded because Mr. Lutterloh has not been qualified as an expert witness. Moreover, Mr. Lutterloh should be precluded from testifying about topics (b) and (e)–(h) because it is either irrelevant, the proper subject of expert testimony, or not based on Mr. Lutterloh's personal knowledge. Finally, Mr. Lutterloh should be precluded from testifying about topics not identified in the Government's disclosure—for example, the Government expressly disclaims that Mr. Lutterloh will testify about "custom and practice in the industry generally or to compare the defendant's conduct to some industry standard," Gov't Opp. at 18, and it should be held to that representation.

11

i.    *Lutterloh's Proposed Testimony is Largely Expert Testimony.*

In response to the defense's motions *in limine*, the Government has narrowed the topics of Mr. Lutterloh's proposed testimony.  Instead of testifying about "life insurance policies and viatical life settlements, including testimony about how such life insurance products operate, are regulated, and are transacted," Nov. 25, 2025 Gov't Letter, the Government now proposes that Mr. Lutterloh will testify about "what a viatical life settlement is" and "that the viatical life settlement market is heavily regulated on a state-by-state level," Gov't Opp. At 16.  While fortunately narrowed, this testimony is nonetheless still the proper subject of expert testimony.

Mr. Lutterloh's proposed testimony about viatical life settlements and about regulations generally is not the subject of proper lay witness testimony.  Testimony about the viatical industry generally and its regulations strays far beyond testimony about Mr. Lutterloh's "own business," Gov't Opp. at 17—such testimony about an industry generally is plainly much broader than testimony about "the policies and procedures of **his employer**," *United States v. Konstantinovskiy*, No. 19-CR-408, 2024 WL 3360379, at *19 (E.D.N.Y. July 10, 2024) (emphasis added).  Indeed, the Government's supposition that the rule against lay witness testimony about industry "custom and practice" is "primarily civil law concept," Gov't Opp. at 17, completely ignores that the Federal Rules of Evidence apply to both civil and criminal cases, *see* Fed. R. Evid. 1101(b), as well as the **criminal** caselaw similarly precluding lay witnesses from testifying about such matters. *See, e.g.*, *United States v. Bradley*, No. 3:21-CR-00087, 2022 WL 1708400, at *6–7 (D. Conn. May 27, 2022) (precluding lay witness testimony about Connecticut statutes and regulations in wire fraud case); *cf. United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 705 (S.D.N.Y. 2011) (stating that the Government must limit lay witness testimony to "the product of the witnesses' participation in the conspiracy rather than their experience in the financial industry more broadly").

12

    *ii.*    *Mr. Lutterloh Should Be Precluded from Testifying about "Heavy" Levels of State Regulation in Secondary Markets, Which Is Irrelevant, Prejudicial, and Likely to Confuse Both the Issues and the Jury.*

Mr. Lutterloh should be precluded from testifying about proposed topic (b), that "the viatical life settlement market is ***heavily*** regulated on a state-by-state level," Gov't Opp. at 16 (emphasis added), because the at-issue transactions occurred in what the Government refers to as the "***tertiary*** market," which is *not* regulated, rather than what the Government refers to as the "***secondary*** market," which is regulated. Such testimony is not only irrelevant but also prejudicial and likely to confuse the jury.

As the Government describes it, there are three types of transactions: (1) primary transactions between an insurance company and an insured; (2) secondary transactions between an insured and an investor; and (3) tertiary transactions between an investor and another investor. Gov't Opp. at 13. Secondary markets are heavily regulated because of policy concerns that individual insureds might be "taken advantage of": as the Government notes, individual insureds in the secondary market are generally elderly, selling a substantial asset in an illiquid market, and providing sensitive medical information. *Id.* Unlike secondary markets, however, tertiary markets "do not raise the same concerns about protecting vulnerable insureds[] and so are much less heavily regulated." *Id.* And, here, the at-issue transactions occurred in the largely unregulated tertiary market. Notably, the Government does not dispute the defense's statement in its motions *in limine* that "there are no regulations which govern the market at issue." Def. Mot. at 19.

Testimony by Mr. Lutterloh about how secondary markets are "heavily regulated" on a state-by-state basis is plainly irrelevant to these tertiary transactions and should be excluded. *See Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12-CV-05803, 2013 WL 978980, at *10 (S.D.N.Y. Mar. 12, 2013) (precluding testimony about irrelevant regulations).

The Government does not even attempt to defend why it should be permitted to introduce the notion of a "heavily regulated" secondary market. Indeed, the Government only ever identifies a *single* regulatory requirement that it believes is relevant: that a provider such as Montage needs to be licensed (Mr. Lutterloh's proposed topic (c)). The Government suggests that that regulatory requirement should be admitted because it is context for understanding Montage's involvement as a licensed provider in the transactions. Fair enough—the defense does not have an objection to that testimony coming in. But, contrary to the Government's position, it is totally unnecessary for Mr. Lutterloh (or anyone) to then testify specifically about the "heavy" regulations in the secondary market. Nor is there any conceivable relevance to testimony about any other regulations pertaining to the second market or their animating policy concerns.

Indeed, there is only **one** regulation that the Government has identified as relevant: the regulation that "creates a role for providers like Montage in the viatical life settlement market." Gov't Opp. at 19. For example, "California Insurance Code section 10113.2(b)(1) . . . says that 'no person may enter into, broker, or solicit life settlements ... unless that person has been licensed by the commissioner,'" *Transamerica Life Ins. Co. v. Rabadi*, No. CV 15-07623, 2017 WL 1405153, at *11 (C.D. Cal. Apr. 18, 2017), *aff'd sub nom. Rabadi v. Lysaght L. Grp. LLP*, 753 F. App'x 463 (9th Cir. 2019), which, in and of itself, suffices to explain Montage's role in the transactions. To provide any context the reasonable juror might need to understand "why investors would utilize Montage at all," Gov't Opp. at 19, Mr. Lutterloh need only testify about the existence of that, or a similar, state regulation. Consequently, the Government should not be permitted to squeeze the elephant of "heavy" regulations through the mousehole of a single regulation.

Moreover, even if the fact that **other** markets are heavily regulated were relevant (it is not), such testimony should be excluded as prejudicial and likely to confuse the jury. The prejudice of

14

introducing this testimony is apparent: the reason that secondary markets are heavily regulated is because of concerns about elder exploitation.  But, because tertiary transactions involve two *investors*—rather than individual insureds themselves—such concerns are totally absent, as the Government itself concedes.  Gov't Opp. at 13.    Thus, introducing testimony about heavy regulation and its underlying policy concerns in the ***secondary market*** might prejudice jurors about these ***tertiary transactions***: should Mr. Lutterloh testify about specific regulations and the reason for those regulations in the secondary market, there is a substantial risk of spillover prejudice, where the jury might draw conclusions about the nature of the transactions at issue in this case, which, again, do not raise the same concerns as in the secondary market because one investor is selling the policy to another investor.

iii.    *Mr. Lutterloh Should be Precluded from Testifying About the At-Issue Transactions, About Which He Lacks Personal Knowledge.*

Mr. Lutterloh should be further precluded from testifying about any of the at-issue transactions here, *i.e.*, explaining the relevant contracts and how transfers of funds corresponded with amounts due. As the Government concedes, Mr. "Lutterloh was not personally involved in the specific transactions at issue."  Gov't Opp. at 15.  Thus, much of Mr. Lutterloh's proposed testimony appears to not be based on his personal knowledge of the at-issue transactions and should be excluded under Rule 602.

To be sure, a corporate employee may generally authenticate business records and testify about the existence of certain documents based upon their review of those business records.  *See* Gov't Opp. at 17.  However, it appears that Mr. Lutterloh's testimony will likely stray well beyond those topics.  For example, Mr. Lutterloh's proposed testimony about the "relevant contracts" (topic (e)) and his explanation that Montage never received copies of contracts and was unaware of those contracts or of the Athlete's "large payments" (topics (g) and (h)) would necessarily

encompass percipient matters *at the time of the transactions*, where Mr. Lutterloh played no role, as the Government admits. *Id.* at 16. Courts routinely reject percipient witness testimony about contract negotiations where the proposed witness "had no personal knowledge or recollection of the contract negotiations relevant to the [at-issue transactions]." *Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.*, No. 19-CV-217, 2024 WL 4107247, at *9 n.9 (E.D.N.Y. Sept. 5, 2024), *appeal withdrawn sub nom. Saugatuck, LLC v. St. Mary's Commons Assocs., LLC*, No. 24-2713, 2024 WL 5321259 (2d Cir. Dec. 13, 2024); *see Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 303 n.42 (S.D.N.Y. 1997) (rejecting testimony concerning contracts negotiations where witness did not have personal knowledge of the negotiations). Indeed, any testimony about how the contracts came to exist and what Montage knew or did not know at the time of the transactions is neither based on Mr. Lutterloh's personal knowledge nor a (permissible) review of currently existing records and documents. *See Novartis Pharma AG v. Incyte Corp.*, No. 1:20-CV-400, 2024 WL 3608338, at *13 (S.D.N.Y. July 29, 2024) (To the extent that [the witness] purports to directly interpret or explain 21 other contracts involving either Incyte or Novartis, any opinions proffered about those 21 contracts themselves are excluded . . . [in part] because [the witness] lacks personal knowledge regarding the intent or context surrounding these contracts' formation and implementation."); *King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*, No. 14-CV-742, 2019 WL 1146461, at *2 n.3 (S.D.N.Y. Mar. 13, 2019) (excluding proposed testimony about "negotiation of the 2008 Agreement" because the witness was not "at all involved in the negotiations of that agreement"). This principle applies with equal force in the criminal context: as the court in *Konstantinovskiy* explained, testimony about transactions "in which the witness was not involved . . . would be permissible only as expert opinion testimony, because it would call for the witness to draw on his experience generally, rather than on his own 'personal perception' of

the matter at issue." 2024 WL 3360379, at *19 (citing *United States v. James*, 607 F. Supp. 3d 246, 259 (E.D.N.Y. 2022)). This proposed testimony is not based on Mr. Lutterloh's personal knowledge and, in any event, will be purely cumulative of Mr. Miller's testimony. *See Flannigan v. Vulcan Power Grp.*, LLC, 642 F. App'x 46, 50 (2d Cir. 2016) (holding that district court did not abuse its discretion in excluding corporate officer's testimony where he lacked personal knowledge of at-issue events, and his testimony was cumulative).

Most egregious is the Government's proposal that Mr. Lutterloh testify about whether Montage received copies of the contracts and "was unaware of (i) the contracts directly between JBM and the Athletes, or (ii) the large payments from the Athletes to JBM." Gov't Opp. at 16. There is simply no basis for a percipient witness in 2026 to testify about what Montage knew of or received in 2017, 2019, or 2020, when the at-issue transactions occurred. Indeed, one of the cases on which the Government relies, *Quinton v. Am. Express Co.*, No. 19-CV-566, 2025 WL 1994848 (E.D.N.Y. July 17, 2025), expressly rejects that a witness may testify "on 'a matter of historical fact' on which she lacks personal knowledge or an expert understanding," *id.* at *8 (internal citation omitted).

Simply put, Mr. Lutterloh cannot testify about "whether Montage (to his knowledge) was aware of certain facts," Gov't Opp. at 18, because he has no such percipient knowledge about what was true for Montage nearly a decade ago.

### B. The Court Should Preclude Some of Mr. Miller's Proposed Testimony.

Likely in recognition of Mr. Lutterloh's inability to testify as a percipient witness, the Government states in its opposition brief that it expects Mr. Miller, "the primary individual at Montage who handled these specific transactions involving JBM," to testify about "(i) his specific communications with Gilder; (ii) his lack of knowledge of the huge profits that Gilder and the defendant were making from these sales; and (iii) how knowledge of those huge profits would

have affected his own conduct, had he been aware of that information at the time." Gov't Opp. at 15–16. While, unlike Mr. Lutterloh, Mr. Miller is a permissible percipient witness who may testify about the at-issue transactions, Mr. Miller should be precluded from testifying about the third proposed topic: how his knowledge of the huge profits "would have" hypothetically affected his conduct, because that testimony is irrelevant, prejudicial, and likely to confuse the jury.

How Mr. Miller would have acted had he known about the "huge profits" is entirely irrelevant to any issue of trial. The Government has not alleged that either Montage or Mr. Miller were victims of fraud (nor could it), and there is no argument that Mr. Miller was entitled to know any information about any "huge profits," so Mr. Miller's hypothetical actions are wholly irrelevant. Indeed, the sole case on which the Government relies to support this line of proposed testimony, *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), deals specifically with how a ***victim*** of fraud would have acted to demonstrate "the impact of [that] fraud," *id.* at 459. Faithfully applying *Cuti*, district courts have made clear that the purpose of this line of questioning is to "prove the materiality of false and misleading representations and half-truth" and "should bear on the impact of [] fraud." *United States v. Peraire-Bueno*, No. 24-CR-293, 2025 WL 2753560, at *3 (S.D.N.Y. Sept. 29, 2025). But neither Mr. Miller nor Montage was the victim of fraud: as the court in *Peraire-Bueno* made clear, this hypothetical line of questioning is impermissible where, for example, the witness "is not an investor and made no trading decision that would be affected by the alleged misrepresentation." *Id.* at *4. This line of precedent squarely forecloses the Government's proposed hypotheticals.

### C. The Court Should Preclude Mr. Melley's Proposed Testimony.

The Government states that FINRA witness Peter Melley intends to testify "about FINRA's role in regulating the financial industry, the promulgation of FINRA rules and guidance, FINRA's role in administering licensing examinations and continuing education trainings, and the topics

covered on those examinations and trainings, including those taken by the defendant." Gov't Opp. at 19. The Government has failed to demonstrate that a lay witness such as Mr. Melley may permissibly testify about these topics, and, even if the Court permits Mr. Melley to testify, it should strictly limit his testimony to the enumerated subjects. Moreover, the Government has failed to identify the relevance of and foundation for both Mr. Melley's testimony and the proposed FINRA rules to any issue at trial. Finally, the defense reincorporates its argument that the FINRA rules should independently be excluded on Rule 403 grounds of prejudice and high likelihood of confusing the jury.

    *i.    Mr. Melley's Testimony Is Inadmissible Expert Opinion.*

First, Mr. Melley's proposed testimony is expert. The Government has failed to identify a binding Second Circuit case in which Mr. Melley (or any of his "colleagues") was permitted to testify about the Government's proposed topics or anything like them. Mr. Melley's testimony about FINRA generally and its rules and policies appears to be "rooted exclusively in his expertise in [his industry]," *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004), and therefore impermissible lay testimony. The Government's equivalence of Mr. Melley's testimony—about FINRA's role in regulating something as complicated and specialized as the entire financial industry—with the defense's lay witness Gary Kohlman's testimony about a specific contract that ***he personally negotiated*** while serving as General Counsel of the National Basketball Players Association is clearly a false one. *See* Gov't Opp. at 23 n.6. The non-precedential summary order on which the Government heavily relies, *id*. at 23, *United States v. Galanis*, 758 F. App'x 71 (2d Cir. 2018), is similarly unconvincing: there, on ***plain-error review***, the Second Circuit upheld the admission of lay witness testimony about "background principles of securities law" because "some degree of specific, industry-related knowledge will not disqualify

lay opinion testimony," *id.* at 74.  Here, by contrast, Mr. Melley's entire testimony appears to be the product of specialized knowledge within the scope of Rule 702 and should be excluded.

To the extent Mr. Melley is permitted to testify at all, Mr. Melley's testimony should be strictly limited to the enumerated topics.  For example, Mr. Melley should not be permitted to testify at all about viatical life settlements, about which he possesses neither firsthand knowledge nor even specialized knowledge.

*ii. The Government Has Failed to Lay a Foundation of Relevance for Mr. Melley's Testimony About FINRA Rules.*

The defense reasserts its argument in its opposition to the Government's motions *in limine* that the Government has wholly failed to proffer a basis for the relevance of or foundation for the admission of the FINRA policies to the at-issue viatical transactions.  "Suitability" standards, for example, have no relevance to the issues at trial, and the Government has failed to identify a basis. Moreover, FINRA Rules 2010 and 2020, which pertain to the "commercial honor" and "deceptive devices," respectively, share key terms—but not all elements—with the at-issue criminal charges, which is likely to prejudice Mr. Cohen by watering down the elements of the criminal charges and confuse and mislead the jury.  *Cf. United States v. Mendlowitz*, No. S2 17-CR-248, 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019), *aff'd*, No. 21-2049, 2023 WL 2317172 (2d Cir. Mar. 2, 2023) (Broderick, J.) (explaining basis for precluding proposed testimony where "the risk of prejudice was high since there was a likelihood of jury confusion that the standard against which [the defendant's] conduct was to be measured was industry practice rather than whether his conduct violated the wire fraud statute.").

**III. The Court Should Preclude Evidence Related to Mr. Cohen's ███████████ Texts.**

The Government states that it does not intend to introduce ████████████████ text messages between Mr. Cohen and Mr. Parsons.  As the defense explained in its opposition to the

Government's motions *in limine*, these ████████████ text messages should be excluded on relevance and Rule 403 prejudice grounds.

But the Government is wrong in making the blanket assertion that the defense's "motion proves the point that any such cross-examination would be improper and should be precluded in this case pursuant to Rule 403." Gov't Opp. at 24. To the contrary, as the defense explained in its opposition, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Cohen's motions *in limine*.


Dated: New York, New York
     January 16, 2026

Respectfully submitted,

*Michael Bloch*

Michael L. Bloch

BLOCH & WHITE LLP
Michael L. Bloch, Esq.
Benjamin D. White, Esq.
Cristina Alvarez, Esq.
90 Broad Street, Suite 703
New York, NY 10004

21

(212) 901-3820
bwhite@blochwhite.com
mbloch@blochwhite.com
calvarez@blochwhite.com

MANCINI SHENK LLP
Mark Sedlander, Esq.
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
(424) 652-4016
msedlander@mancinishenk.com

*Counsel for Darryl Cohen*